STATE of Minnesota, Respondent,

v.

Larry Larue CLARK, Appellant.

No. A06–1476.

Supreme Court of Minnesota.

Aug. 28, 2008.

Lawrence Hammerling, Chief Appellate Public Defender, Gurdip Singh Atwal, Assistant State Public Defender, Office of the State Public Defender, Saint Paul, MN, for appellant.

Susan Gaertner, Ramsey County Attorney, Jeanne L. Schleh, Assistant Ramsey County Attorney, Saint Paul, MN, for respondent.

## OPINION

PAUL H. ANDERSON, Justice.

A Ramsey County jury found Larry Larue Clark guilty of first-degree premeditated murder while aiding and abetting or being aided and abetted by another in violation of Minn.Stat. §§ 609.185(a)(1) and 609.05, subd. 1 (2006) for the 1970 shooting death of Saint Paul Police Officer James Sackett. The district court convicted Clark for this crime and sentenced him to life in prison. In this direct appeal Clark

raises five issues: (1) whether an assistant county attorney is authorized by law to frame an indictment before a grand jury; (2) whether the district court erred in failing to instruct the jury that certain witnesses were accomplices as a matter of law; (3) whether the evidence is sufficient to support the jury's verdicts; (4) whether the court erred when it instructed the jury that the State was not required to prove that Reed was Clark's conspirator or accomplice; and (5) whether it was error for the court to have admitted evidence of Clark's 1971 bank robbery conviction. We conclude that: (1) an assistant county attorney may attend a grand jury for purposes of framing the indictment and examining witnesses; (2) that the court's failure to give sua sponte an accomplice instruction was plain error requiring remand for a new trial; (3) the evidence may be sufficient to support the conviction if the accomplice's instruction is corroborated; (4) the jury instructions are not required to match the indictment; and (5) the evidence of other crimes is relevant and not overly prejudicial. Therefore, we reverse Clark's conviction and remand for a new trial.

In 1969, appellant, Larry Larue Clark, and his friend, Ronald Reed, were teenagers living in the Selby–Dale neighborhood of Saint Paul, Minnesota. Clark and Reed frequented the Inner City Youth League, along with other young people from the neighborhood. Reed emerged as the leader of a group of these young people. According to Joseph Garrett, the group's self-described "minister of information," the group used the name United Black Front. At their meetings, the group discussed black-empowerment and self-protection from the police. At this time, the tension between the police and these young people was high. In the months preceding the murder of Saint Paul police officer James Sackett, at least two of the neighborhood's young men had been shot by the police. These shootings further increased the tension between members of the United Black Front and the police. As a result, the rhetoric at the United Black Front's meetings became more inflammatory. At Clark's trial there was testimony that Reed and others in the group wanted authority from the Black Panther Party to organize a chapter in Saint Paul and that members of the group thought that if they got national attention by killing a police officer it would increase their chances of success. Witness testimony indicated that Reed was a strong advocate for killing a police officer and that Clark agreed with Reed. Several of the group's members carried guns, and Reed and Clark were seen together with a bolt-action rifle on a number of occasions.

Just after midnight on Friday, May 22, 1970, the Saint Paul police received an emergency telephone call requesting assistance for a woman in labor at 859 Hague Avenue in the Selby–Dale neighborhood. Officer Sackett and his partner, Officer Glen Kothe, responded to the call, parked their police car in front of 859 Hague, went to the front door, and knocked. When no one in the house came to the door, Kothe walked to the back door and knocked. Hearing a dog bark inside, Kothe started to warn Sackett about the dog, and, as he did so, he saw a bright flash, heard a loud bang, and heard a scream. Running to the front of the house, Kothe found Sackett lying on the ground, bleeding. Kothe realized that Sackett had been shot and radioed for assistance. At some point, a crowd, including Reed and other members of the United Black Front, gathered at the scene. Clark was not identified as having been present in the crowd. Sackett later died as a result of a gunshot wound to the chest.

In the ensuing investigation, the police determined that no one at the 859 Hague

address had placed the emergency call or was involved in the shooting. They also concluded that the shot that killed Officer Sackett came from a southwesterly direction. A search of the surrounding area, however, produced no evidence of the shooting. Although no weapon or shell casing was found in the area, the police determined that the shot that killed Sackett probably came from a single-shot, bolt-action rifle. The police also determined that the emergency call that preceded the shooting was made from a telephone booth one block away at the corner of Selby Avenue and Victoria Street. No fingerprints or other useable evidence were found on or in the booth. At the time of the shooting, Clark lived at 882 Hague, which was approximately 102 yards west of 859 Hague on the south side of the street. The house at 859 Hague is located on the north side of the street.

Through voice-print analysis, the police were eventually able to identify Constance Trimble as the person who made the May 22nd telephone call. Trimble was Reed's girlfriend and the mother of his child. Trimble was arrested in October 1970 and, after a 1972 jury trial, she was acquitted of Sackett's murder. At her trial, Trimble testified that she had been told the telephone call was being made as a ruse to set up Gerald Starling for a drug bust in retaliation for Starling having allegedly threatened Trimble's family. Trimble refused, both during and after her trial, to identify the person who asked her to make the call. As a result, she was held in contempt of court and remained in jail for a period of time after her acquittal.

Further investigation revealed that just after midnight two nights before the shooting, Saint Paul police went to 867 Hague as a result of a similar medical emergency call. On that occasion, officers arriving at the 867 Hague address parked at the rear of the house, and, when there was no response to the officers' knocking, the call was written off as unfounded.

In October 1970, Reed and Clark, along with Horace Myles, were involved in an attempted armed bank robbery in Omaha, Nebraska. An off-duty police officer, working as a security guard at the bank, was shot by Myles when the officer tried to thwart the robbery. Reed and Clark also fired weapons during the robbery attempt. Clark was arrested for the attempted robbery 10 days later. Reed was arrested roughly two weeks after Clark at an acquaintance's apartment in Minneapolis. The police found Reed lying on a bed, with a handgun under the bed within his reach. In Reed's pants pocket the police found a note suggesting that Reed was planning to hijack an airplane and a to-do list for the hijacking. Reed hoped to use the hijacking as a means to gain the release of Trimble, Clark, and Gary Hogan, a friend of Reed's who was in jail on unrelated charges. The note demanded publicity for the Black Panther Party and $50,000 in gold. A search of the apartment produced a handgun, a flare, a sawed-off shotgun, and a duffel bag holding walkie-talkies. In 1971, Reed and Clark were convicted of the attempted bank robbery in Omaha. *State v. Reed*, 188 Neb. 815, 199 N.W.2d 707 (1972); *State v. Clark*, 189 Neb. 109, 201 N.W.2d 205 (1972). But neither Reed, Clark, nor anyone else was arrested in connection with Sackett's murder, and the investigation stalled.

In 1994, a television reporter interviewed Trimble about Officer Sackett's murder. Trimble refused to disclose who had asked her to make the false emergency telephone call. In 1995, the Saint Paul police contacted Trimble, at which time she admitted that Reed was with her when she made the call, but she refused to pro-

vide any further information. In 2004, at her request, Trimble met with the police and disclosed for the first time that Reed had asked her to make the call and had given her a script to read. She told the police that Reed drove the two of them, along with their baby, to the telephone booth. She also stated that after the call was made, Reed drove them directly from the booth to Clark's house to get some marijuana.

Following this subsequent investigation, a grand jury was convened to determine whether there was probable cause to indict Reed and Clark. Two witnesses who ultimately testified at Clark's trial also testified before the grand jury. In 2005, Reed and Clark were indicted for aiding and abetting each other (count 1) and for conspiring with each other (count 2) to kill Officer Sackett. A warrant upon indictment was issued for Clark's arrest, and Clark was taken into custody two days after the indictment. As noted earlier, Reed was tried first and was found guilty on both counts. We affirmed Reed's conviction on direct appeal. See State v. Reed, 737 N.W.2d 572, 590 (Minn.2007).

Clark went to trial on April 10, 2006. At Clark's trial, Donald Walker testified that he frequented the Inner City Youth League in the late 1960s and early 1970s. He also attended "so-called Black Panther Party meetings" at a neighborhood church, at which Reed and Clark would make intense, motivational statements of hatred toward white people, the government, and the police. Walker did not recall any times when the discussions turned to plans of violence or to killing police officers, but he did testify that he "transported" a single-shot, bolt-action rifle for Reed and Clark on at least two occasions when he gave them a ride. At times, Walker's trial testimony conflicted with his grand jury testimony regarding the number of "Black Panther Party meetings" he attended and the number of times he gave Reed and Clark a ride when they were carrying a rifle.

Anthony Foster also testified that he attended the United Black Front meetings. Foster stated that at the meetings Reed talked about killing a police officer to attract national attention in order to get permission to start a Black Panther chapter in Saint Paul. He further testified that Reed, Arthur Harper, and Arling Reese came to his apartment a few days after Officer Sackett was shot and that Reed would not respond to his attempts to discuss the shooting. The defense asserted that Foster's testimony may not have been entirely accurate, as both Reese's trial testimony and records introduced at trial indicate that Reese was incarcerated in Moorhead, Minnesota, from April through August 1970, and, therefore, Reese could not have been present at Foster's apartment a few days after the shooting.

Trimble's account of events differed in some respects from her statements to investigators, her testimony at her trial, her testimony to the grand jury, and her testimony at Reed's and Clark's trials. At Clark's trial, she testified that Reed drove her directly to Clark's house after she placed the false emergency telephone call, that Clark was waiting outside the back door of his house when they arrived, and that she and Reed remained there for five to seven minutes before driving home. At her own trial, Trimble testified that she went to buy cigarettes after making the call and that Reed was home asleep when she returned. At both Reed's and Clark's trials, she testified that neither Reed nor Clark left Clark's house while she was there. During her grand jury testimony, however, Trimble testified as follows:

Q: [A]fter you met up with Larry Clark who was standing in the back of his house, where did you go?

A: I went into the house ... I went into the restroom.

. . . .

Q: Could [Clark and Reed] have left?

A: They could have, you know. Now that I think about it, they could have, you know.

Trimble did not provide any explanation for the inconsistencies in her statements.

Joseph Garrett, the "minister of information" for the United Black Front, also testified at Clark's trial. Garrett testified that Reed and others at the United Black Front meetings advocated protecting themselves from the police "by any means necessary." Garrett further testified that he, together with Clark and others, agreed with that proposition. According to Garrett, members of the United Black Front "tended to be armed." He testified that he had access to several bolt-action, 30–caliber rifles that he had stolen and later sold, but, as far as he knows, none of the stolen rifles went to anyone else in the group. Garrett testified that Reed had approached him a few weeks before Sackett's murder about being involved in "bring[ing] down the first pig." Garrett understood this to mean killing a police officer. He testified that Reed knew of Garrett's combat experience in Vietnam and expert marksmanship. He also testified that he did not answer Reed at the time and never spoke with Reed about it after that.

Garrett also testified that a week before the Sackett shooting he felt he was being harassed by the police during a traffic stop and told the officers involved to "watch the rooftops." There was testimony from other witnesses that the officers took the comment to mean "beware of snipers." At least two police officers saw Garrett in the crowd that gathered after the shooting. The officers placed him in a squad car and asked about his "watch the rooftops" remark. Garrett said the rooftop comment was made in anger and that he knew nothing about the shooting. Garrett testified, however, that he also told the police about out-of-state Black Panther sympathizers in an effort to "throw [the police] off track." According to Garrett, after he got out of the squad car, the "sergeant in arms" of the United Black Front, Kelly Day, who also was in the crowd, told Garrett to keep his mouth closed.

Arthur Harper testified that he, Day, Reed, and Clark often socialized at Day's apartment, located at 844 Dayton Avenue. The apartment was less than two blocks from where Officer Sackett was shot. According to Harper, Reed often made statements, with which Clark agreed, that the police were the oppressors and needed to be taught a lesson. Harper further testified that he was with Reese when he saw Reed and Clark leave Day's apartment at about 11:30 p.m. the night of Sackett's murder and that, at the time, Reed appeared to be carrying a bolt-action rifle. As noted earlier, it appears Reese was in jail at that time. Harper also testified that he heard a gunshot 15 to 20 minutes later and that a few minutes later he walked south on Selby, in the direction the police cars were heading. Harper further testified that he joined Day, who was standing in front of the Inner City Youth League, and they were joined by Reed sometime later.

The State also presented evidence regarding bombings that occurred around the time of Officer Sackett's shooting. Sergeant Russell Bovee testified that Gary Hogan was convicted for the August 1970 bombing of Dayton's department store in downtown Saint Paul. According to Bovee, the bombing involved two bombs: the

first, smaller one to draw a police response and the second, bigger one to kill the responding police officers. Sergeant Paul Paulos testified that on September 12, 1970, he searched a garage rented by Day. In the garage, Paulos found a car containing 12 cases of dynamite.

Neither Clark nor Reed testified at Clark's trial. Clark called 21 witnesses to testify for the defense. In large part, the testimony elicited from the defense's witnesses included statements regarding (1) the monetary and penal incentives given to some of the State's witnesses; (2) the lack of evidence linking Clark to the crime scene; (3) the criminal activities of other members of the United Black Front and of people involved in the Inner City Youth League; (4) alternative perpetrators; (5) bullet trajectories; and (6) the social history of the era and the Black Panther Party.

At trial, the district court, over the defense's objection, allowed evidence of Clark's and Reed's 1971 bank robbery convictions to prove intent and motive to shoot a police officer. The court gave a limiting instruction to the jury about the use of this other crimes evidence both immediately before the jury heard the testimony about the convictions and at the end of Clark's trial. Clark also objected to the court's jury instruction on conspiracy. Clark argued that the jury should be instructed that the State must prove he conspired with Reed to shoot a police officer because that was how the indictment read, rather than having to prove simply that he conspired with an unknown person to shoot an officer.

The jury found Clark guilty on both counts of the indictment. The district court then convicted him of aiding and abetting and sentenced him to life in prison. Clark argues on this direct appeal that (1) an assistant county attorney is not authorized by law to frame an indictment

before the grand jury; (2) the district court erred in failing to instruct the jury that certain witnesses were accomplices as a matter of law; (3) the evidence is insufficient to support the jury's verdicts; (4) the court erred when it instructed the jury that the State was not required to prove that Reed was Clark's conspirator or accomplice; and (5) it was error for the court to have admitted evidence of Clark's 1971 bank robbery conviction.

I.

■ We first address Clark's argument that his conviction should be reversed and the indictment should be dismissed under Minn.Stat. § 628.63 (2006). Clark argues that the statute provides that *only* an elected county attorney may appear before a grand jury and frame the indictment. According to Clark, because the elected Ramsey County Attorney did not appear and frame the indictment in his case, the assistant county attorneys who attended the grand jury meeting and framed the indictment in the County Attorney's absence were not authorized to do so.

■ Whether Minnesota law permits an assistant county attorney to attend the grand jury meeting and frame the indictment requires us to construe a number of statutes, which we do de novo. *Broehm v. Mayo Clinic Rochester,* 690 N.W.2d 721, 732 (Minn.2005). The object of statutory interpretation is to determine and effectuate legislative intent. *State v. Zeimet,* 696 N.W.2d 791, 793 (Minn.2005). We construe statutes to avoid absurd results. *Am. Family Ins. Group v. Schroedl,* 616 N.W.2d 273, 278 (Minn.2000). "Statutes relating to the same subject are presumed to be imbued with the same spirit and to have been passed with deliberation and full knowledge of all existing legislation on the subject and regarded by the lawmakers as being parts of a connected whole." *Kal-*

*juste v. Hennepin County Sanatorium Comm'n,* 240 Minn. 407, 414, 61 N.W.2d 757, 762 (1953). We also construe statutes as a whole and "must interpret each section in light of the surrounding sections to avoid conflicting interpretations." *Am. Family Ins. Group,* 616 N.W.2d. at 277.

Minnesota Statute § 628.63 requires that "the county attorney shall attend [the grand jury] for the purpose of framing indictments or examining witnesses...." "'Shall' is mandatory." Minn.Stat. § 645.44, subd. 16 (2006). Similarly, Minnesota Statute § 388.051 (2006) provides: "The county attorney shall ... attend before the grand jury, give them legal advice, and examine witnesses in their presence." Minnesota Statute § 388.10 (2006), however, authorizes a county attorney to appoint "one or more attorneys for assistance in the performance of [his or her] duties" who "shall have the same duties and be subject to the same liabilities as the county attorney."

■ Minnesota Statute § 628.63 was first enacted by the territorial legislature. Knowing that section 628.63 provided for the county attorney's presence before the grand jury for the purposes of framing the indictment and examining witnesses, the state legislature subsequently enacted Minn.Stat. § 388.051 in 1860, mandating that the county attorney shall "attend before the Grand Jury of such county upon the special request of said jury, and examine witnesses in their presence; he shall give them advice in any legal matter before them...." Minnesota Statute § 388.10 was enacted in 1921. We presume the legislature knew the duties prescribed to the "county attorney" in sections 628.63 and 388.051 when it later enacted Minn.Stat. § 388.10 authorizing the appointment of assistant county attorneys to perform the county attorney's duties. *See Kaljuste,*

240 Minn. at 414, 61 N.W.2d at 762. Therefore, reading all three statutes as parts of a connected whole, we conclude that the legislature intended to permit assistant county attorneys to perform certain duties of the county attorneys, including attending grand jury meetings for the purposes of framing indictments and examining witnesses.

To support his arguments, Clark relies on *State v. Frink,* 296 Minn. 57, 206 N.W.2d 664 (1973), but we conclude that this reliance is misplaced. In *Frink,* we analyzed Minn.Stat. § 388.10 as applied to the Minnesota Privacy of Communications Act, Minn.Stat. § 626A.05, subd. 1 (2006), which was enacted after section 388.10. In part, our holding was based on our conclusion that the more specific statute, section 626A.05, prevailed over the more general section 388.10. We held that only the county attorney—and not an assistant county attorney—may apply for a wiretap warrant under Minn.Stat. § 626A.05, subd. 1. *See Frink,* 296 Minn. at 66, 206 N.W.2d at 669. Section 626A.05, subd. 1, provides, in relevant part, "The attorney general or a county attorney of any county may make application as provided in section 626A.06, to a judge of the district court, of the Court of Appeals, or of the Supreme Court for a warrant...." Minn.Stat. § 626A.05, subd. 1. The narrow issue we addressed in *Frink* is distinguishable from the issue presented here. The case before us, unlike *Frink,* involves three statutes addressing the same general topic-the duties of county attorneys. Of the three statutes, Minn.Stat. § 388.10, authorizing the county attorney to appoint assistant county attorneys to perform the county attorney's duties, was the last to be enacted. Another significant distinction between this case and *Frink* is that the statute at issue in *Frink,* the Minnesota Privacy of Communications Act, a criminal statute, was en-

acted pursuant to the provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1958. 18 U.S.C. §§ 2510–2520 (2006). This federal legislation limited the authority to apply for wiretap warrants to "principal prosecuting attorney[s]." *Id.* § 2516. *Frink* involved an assistant county attorney who applied for a wiretap warrant without the knowledge or consent of the county attorney. *Frink,* 296 Minn. at 66, 206 N.W.2d at 669. Reading the Minnesota statute in light of the federal legislation led us to the conclusion that to allow, on the facts presented, an assistant county attorney to apply for a wiretap warrant would put the Minnesota statute in conflict with federal law. That is not the situation presented here. Thus, we conclude that our decision in *Frink* does not support Clark's argument that assistant county attorneys are not authorized to attend grand jury meetings for the purpose of framing an indictment, giving legal advice, and examining witnesses.

For all the foregoing reasons, we hold that the fact that an assistant county attorney attended the grand jury meeting and framed the indictment against Clark does not render Clark's indictment and conviction legally deficient such that the indictment must be dismissed and the conviction overturned.

## II.

Clark next claims that his conviction should be reversed and that he should receive a new trial because Trimble was an accomplice whose testimony at trial was not corroborated. At his trial, Clark did not request an accomplice instruction nor did he object to the admission of Trimble's testimony on those grounds.

■■■ Under Minnesota law, a criminal conviction cannot be based on the uncorroborated testimony of an accomplice. Minn.Stat. § 634.04 (2006) ("A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."). This statutory rule reflects an inherent distrust of testimony from accomplices, who "may testify against another in the hope of or upon a promise of immunity or clemency or to satisfy other self-serving or malicious motives." *State v. Shoop,* 441 N.W.2d 475, 479 (Minn.1989); *accord State v. Sorg,* 275 Minn. 1, 5, 144 N.W.2d 783, 786 (1966). The statute contemplates that the issue of whether an accomplice's testimony has been sufficiently corroborated is a question of fact to be determined by the jury. *See Shoop,* 441 N.W.2d at 479. Accordingly, we have held that "[a]s a rule, trial courts have a duty to instruct juries on accomplice testimony in any criminal case in which it is reasonable to consider any witness against the defendant to be an accomplice." *State v. Strommen,* 648 N.W.2d 681, 689 (Minn.2002); *accord Shoop,* 441 N.W.2d at 479. A witness is considered an accomplice if "[she] could have been indicted and convicted for the crime with which the accused is charged." *State v. Lee,* 683 N.W.2d 309, 314 (Minn. 2004).

### Failure to Give Accomplice Instruction

■■■ We first consider whether the district court erred in failing to instruct the jury on accomplice testimony. Because Clark failed to either ask for or object to the absence of such an instruction, our review of this issue is governed by the plain error analysis. *See State v. Reed,* 737 N.W.2d 572, 584 (Minn.2007). Therefore, we must determine whether the court committed an error, whether the error was plain, and whether the error affected

Clark's substantial rights. *Id.* at 583. If each of these requirements is satisfied, we must then consider whether reversal of Clark's conviction is necessary to ensure fairness and the integrity of the judicial process. *Id.*

■ In 1972, a jury acquitted Trimble of first-degree murder in the shooting death of Officer Sackett. Thus, Trimble could not, consistent with the Double Jeopardy Clause of the Constitution, again be indicted and tried for that crime. But as we recognized in *State v. Reed,* conspiracy to commit first-degree murder is not a lesser-included offense of first-degree murder. 737 N.W.2d at 583. Accordingly, we recognized that Trimble "could theoretically be charged with conspiracy to commit murder, the same crime of which Reed has been convicted," and that she therefore "could reasonably be considered an accomplice." *Id.* Like Reed, Clark was also convicted of conspiracy to murder Officer Sackett. Thus, as in *Reed,* a jury could reasonably conclude that Trimble is an accomplice in this case.

Under the plain error analysis, we generally consider an error to be "plain" if it "contravenes case law, a rule, or a standard of conduct." *State v. Ramey,* 721 N.W.2d 294, 302 (Minn.2006). As noted above, we have unambiguously held that "trial courts have a duty to instruct juries on accomplice testimony in any criminal case in which it is reasonable to consider any witness against the defendant to be an accomplice." *Strommen,* 648 N.W.2d at 689. Because it was reasonable for a jury to consider Trimble to be an accomplice, we conclude that the district court committed an error that was plain by failing to instruct the jury on accomplice testimony.

■ The third prong of the plain error analysis requires us to consider whether an error affected the defendant's substantial rights. "[A]n error affects substantial rights when there is a 'reasonable likelihood' that the absence of the error would have had a 'significant effect' on the jury's verdict." *Reed,* 737 N.W.2d at 585 (citation omitted). In *Reed,* we concluded that the failure to give the accomplice instruction did not affect Reed's substantial rights because "the weight of [the non-accomplice witnesses'] collective testimony was sufficient to corroborate [Trimble's] testimony." *Id.* But the State's evidence at Reed's trial was stronger than the State's evidence against Clark. Notably, at Reed's trial, Garrett, a trained sharpshooter, testified that Reed tried to recruit him for help in "bringing down the first pig"; Trimble testified that she and Reed made the false emergency telephone call; Foster testified that Reed's behavior shortly after the shooting was dejected and abnormal; and John Griffin testified that, in the early 1980s, Reed told him that "when [Reed] put a bead on that officer * * * he felt powerful," but "when he seen the bullet hitting him, he said he never felt more f[* * *]ed up in his life." [1] *Id.* at 578–79, 585 (third alteration added). Without this evidence, the State's case against Clark was necessarily more dependent on Trimble's testimony; at the same time, the evidence available to corroborate her testimony was weaker. Therefore, we conclude that the district court's failure to instruct the jury on accomplice testimony affected Clark's substantial rights. We also conclude that reversal of Clark's conviction

---

1. Although testimony about Reed's attempt to recruit another individual to help kill a police officer was admitted into evidence at Clark's trial, there is no evidence that Clark was involved in any way with this recruitment. Thus, this evidence is significantly less probative of Clark's involvement in Officer Sackett's murder than it was of Reed's involvement. Reed's apparent confession was not introduced into evidence at Clark's trial.

is necessary in this case to ensure fairness and the integrity of the judicial process. Accordingly, we hold that the court committed plain error when it failed to give the accomplice jury instruction and that Clark's convictions must therefore be reversed on this basis.

*Corroboration*

The foregoing conclusion does not end our inquiry. The dissent links two of Clark's arguments—that Trimble's testimony is not corroborated and that the evidence presented is insufficient to sustain his convictions—and concludes that no reasonable jury could have found that Trimble's testimony was corroborated. Viewing the remaining evidence as being insufficient to sustain Clark's conviction, the dissent then concludes that we must reverse outright.[2] Therefore, we proceed to determine whether a reasonable jury could conclude that Trimble's testimony was corroborated.

Because the accomplice testimony rule is based on the fear of self-serving dishonesty by accomplice witnesses, *see Shoop*, 441 N.W.2d at 479, we have long held that evidence is sufficient to corroborate an accomplice's testimony "when it is weighty enough to restore confidence in the truth of the accomplice's testimony," *Sorg*, 275 Minn. at 5, 144 N.W.2d at 786; *accord State v. Scruggs*, 421 N.W.2d 707, 713 (Minn.1988). This burden is met when the defendant is linked to the alleged crime by corroborating evidence that "in some substantial degree tends to affirm the truth of [the accomplice's] testimony and to point to the guilt of the defendant." *State v. Rasmussen*, 241 Minn. 310, 313, 63 N.W.2d 1, 3 (1954); *accord Sorg*, 275 Minn. at 5, 144 N.W.2d at 786; *State v. Mathiasen*, 267 Minn. 393, 398, 127 N.W.2d 534, 538 (1964). The precise "quantum of corroborative evidence needed necessarily depends on the circumstances of each case," but corroborative evidence does not need to be suffi-

2. The dissent bases its conclusion that outright reversal is warranted on the United States Supreme Court's decisions in *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), and *Lockhart v. Nelson*, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988). In *Burks*, the Court held that "the Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient." 437 U.S. at 18, 98 S.Ct. 2141. But in *Lockhart*, the Court stated that *Burks* was "an exception to the general rule" that defendants may be retried when convictions are reversed for errors in the trial proceedings. 488 U.S. at 39, 109 S.Ct. 285. The Court also noted that *"Burks* was careful to point out that a reversal based solely on evidentiary insufficiency has fundamentally different implications, for double jeopardy purposes, than a reversal based on such ordinary 'trial errors' as the 'incorrect receipt or rejection of evidence,' " even if the admissible evidence presented was insufficient to support the conviction. *Id.* at 40, 109 S.Ct. 285 (quoting *Burks*, 437 U.S. at 14–16, 98 S.Ct. 2141).

The issue of whether a district court's failure to instruct a jury on accomplice testimony is the type of ordinary trial error that allows retrial, even if the remaining evidence was not sufficient to support the verdict, or whether such error requires outright reversal like an insufficiency of the evidence claim was not briefed by the parties. Indeed, Clark does not claim that the failure to give the accomplice instruction requires outright reversal, but instead argues that this error entitles him to a new trial. But without analysis, the dissent asserts that the error in this case falls within the second category and that outright reversal is therefore necessary if the remaining evidence was not sufficient to support Clark's convictions. We do not believe that this issue is so clear, but because we conclude that a reasonable jury could have found that Trimble's testimony was corroborated, and that this testimony therefore should not be excluded from the analysis as a matter of law, we do not reach this issue in this case.

cient to establish a prima facie case of the defendant's guilt or sustain a conviction. *Scruggs,* 421 N.W.2d at 713; *accord State v. Pederson,* 614 N.W.2d 724, 732 (Minn. 2000); *Sorg,* 275 Minn. at 5, 144 N.W.2d at 786; *Mathiasen,* 267 Minn. at 398, 127 N.W.2d at 538; *Rasmussen,* 241 Minn. at 313, 63 N.W.2d at 3.

▮ In determining whether an accomplice's testimony is corroborated, "[t]he defendant's entire conduct may be looked to for corroborating circumstances." *Scruggs,* 421 N.W.2d at 713. "Circumstantial evidence may be sufficient to corroborate the testimony of an accomplice." *Rasmussen,* 241 Minn. at 313, 63 N.W.2d at 3; *accord Scruggs,* 421 N.W.2d at 713. Relevant facts that may be used to corroborate an accomplice's testimony and link the defendant to the crime include:

> participation in the preparation for the criminal act; opportunity and motive; proximity of the defendant to the place where the crime was committed under unusual circumstances; association with persons involved in the crime in such a way as to suggest joint participation; possession of an instrument or instruments probably used to commit the offense; and unexplained affluence or possession of the fruits of criminal conduct.

*Sorg,* 275 Minn. at 5, 144 N.W.2d at 786; *accord Scruggs,* 421 N.W.2d at 713.

▮ During Clark's trial, the State introduced evidence that Reed and Clark were close friends and were both members of the United Black Front, that Clark was present at meetings where Reed advocated killing a police officer as part of an attempt to bring a Black Panther chapter to Saint Paul, that Clark expressed agreement with these statements, and that both Reed and Clark made statements of hatred toward the government and the police in an "intense" and "pumped up" atmosphere. Additionally, the State introduced evidence that on multiple occasions before the shooting, Reed and Clark had been seen in possession of a single-shot, bolt-action rifle like the one used to kill Officer Sackett. The evidence also showed that Clark's house was located only 102 feet from the place where Officer Sackett was killed and was in the direction from which the fatal shot was fired. At approximately 11:30 p.m.—one-half hour before the shooting—Reed was seen carrying a rifle and walking with Clark toward Clark's house. Voice-print analysis established that Trimble placed the emergency call that led to the shooting from a public telephone located approximately one block from the crime scene. Finally, the State introduced evidence of a bank robbery in which both Reed and Clark participated and during which a off-duty police officer was shot.

This evidence points to Clark's guilt by suggesting that Reed and Clark shared a motive for killing Officer Sackett, placing the two men in proximity to the crime scene under unusual circumstances,[3] placing them in possession of a weapon consis-

---

3. The dissent states that the evidence does not place Reed and Clark in proximity to the crime scene under unusual circumstances because "it was not unusual for Reed and Clark to be seen together with a rifle present." But the only evidence in the record supporting the dissent's assertion that "it was not unusual for Reed and Clark to be seen together with a rifle present" is Donald Walker's testimony that he had "transported" a rifle for Reed and Clark on at least two occasions when he gave them a ride and Joseph Garrett's testimony that members of the United Black Front "tended to be armed." We do not believe that it was generally a common practice for individuals to carry a rifle down a public street at 11:30 p.m.—a time that was shortly before Officer Sackett was shot—and nothing in the record of this case suggests that this was a common practice for either Reed or Clark.

tent with the one used in the commission of the crime, and indicating an association between them such as to suggest their joint participation in criminal activity. Additionally, the voice-print analysis affirmed the truth of Trimble's testimony by confirming that she made the false emergency call from the telephone booth located one block from the crime scene.

The dissent's conclusion that Trimble's testimony was uncorroborated "as a matter of law" is based on the fact that specific statements during Trimble's testimony were not corroborated by outside evidence. For example, despite conceding that "the voice print analysis evidence seems to corroborate Trimble's testimony that she made the false emergency call," the dissent states that "[the voice-print analysis] does not directly or circumstantially corroborate her claim that Reed asked her to make the call or any of her other testimony." The dissent also notes in two places that the evidence in this case does not corroborate Trimble's testimony "that there was no rifle in the car, that she and Reed drove to Clark's house after she made the phone call, and that Clark was standing outside his back door when they arrived." But by focusing so narrowly on whether the evidence corroborated specific statements during Trimble's testimony, we believe that the dissent departs from the principles that have guided our analysis of accomplice-testimony corroboration since we decided *Rasmussen,* 241 Minn. at 313, 63 N.W.2d at 3, over 50 years ago. The dissent's narrow focus would also reverse our longstanding rule by requiring the introduction of independent evidence to prove every aspect of the accomplice's testimony that is probative of the defendant's guilt.

█ Finally, we address the dissent's assertion that we have "retreated on our longstanding requirement that in order for evidence to corroborate an accomplice's testimony it must have both some tendency to affirm the truth of the accomplice's testimony and at the same time point to the defendant's guilt." We disagree with the dissent's view of our precedent as requiring that a single piece of corroborating evidence satisfy both corroboration requirements. Rather, we read our precedent as requiring that the evidence *as a whole* must both affirm the truth of the accomplice's testimony and point to the defendant's guilt.[4]

---

4. Our decision in *State v. Guy,* 259 Minn. 67, 105 N.W.2d 892 (1960), is instructive on this point. Guy was convicted of forgery involving the cashing of a counterfeit payroll check at Meyers Department Store in Minneapolis. *Id.* at 68–69, 105 N.W.2d at 894–95. At Guy's trial, Archer testified that he and LeMon received an envelope containing 10 checks and a false driver's license from Guy and that the two proceeded to cash the checks at several Minneapolis stores, including the check cashed at Meyers Department Store. *Id.* During the course of cashing these checks, Archer and LeMon purchased a used automobile to travel between the stores. *Id.* at 69, 105 N.W.2d at 895. Guy subsequently arranged to have that automobile picked up from Archer. *Id.* As corroboration of Archer's testimony, the State introduced evidence that the automobile was subsequently found in front of the home of one of Guy's friends, who had cashed a similar counterfeit payroll check. *Id.* at 69–70, 105 N.W.2d at 895. Additionally, another witness, who was illiterate, testified that he was driven to a house in Minneapolis by a man named Cary. *Id.* at 70, 105 N.W.2d at 895. After Guy arrived at the house and had a conversation with Cary in another room, the witness was then driven by Cary and another man to a number of stores to cash counterfeit checks. *Id.,* 105 N.W.2d at 895–96.

The evidence that the automobile purchased by Archer was found outside the home of one of Guy's friends affirmed the truth of part of Archer's testimony, but it did not point to Guy's guilt in cashing a counterfeit check at Meyers Department Store. The dissent asserts that two pieces of evidence—the testimo-

Consistent with the basic rule that corroborating evidence need only be sufficient to restore confidence in the truthfulness of the accomplice's testimony, we have repeatedly stated that the quantum of corroboration needed varies with the unique circumstances of each case. *See Pederson,* 614 N.W.2d at 732; *Scruggs,* 421 N.W.2d at 713; *Mathiasen,* 267 Minn. at 398, 127 N.W.2d at 538. The circumstances of this case do not suggest that there is a significant danger that Trimble has been induced to offer incriminating testimony against Clark based on self-serving motives. Even though she received immunity from federal prosecution, we noted in *Reed* that "[Trimble's] efforts to absolve Reed of complicity in the shooting belie the suggestion that she was a pawn of the state." *Reed,* 737 N.W.2d at 585. Similarly, Trimble's testimony during Clark's trial differed from her grand jury testimony in a way that appears to have benefited Clark.

For all the foregoing reasons, we conclude that a reasonable jury could have found that the corroborating evidence was sufficient to restore confidence in the truth of Trimble's testimony.

*Sufficiency of the Evidence*

Clark argues that the evidence presented at his trial was insufficient to support the jury's guilty verdicts of aiding and abetting first-degree premeditated murder and conspiracy to commit first-degree premeditated murder. In *Burks v. United States,* the United States Supreme Court held that "[t]he Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." 437 U.S. 1, 11, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). Accordingly, where the evidence at a trial was "legally insufficient" to support a conviction, "the only 'just' remedy * * * is the direction of a judgment of acquittal." *Id.* at 18, 98 S.Ct. 2141. Thus, even though we conclude that Clark's conviction must be reversed based on the district court's failure to instruct the jury on accomplice testimony, we must also address Clark's sufficiency argument to determine whether the appropriate remedy is to remand for a new trial or a judgment of acquittal.

"When reviewing a claim of evidentiary insufficiency, we view the evidence in the light most favorable to the verdict and assume that the factfinder disbelieved any testimony conflicting with that verdict." *State v. Leake,* 699 N.W.2d 312, 319 (Minn. 2005); *accord State v. Sanchez–Diaz,* 683 N.W.2d 824, 831 (Minn.2004) ("The court views the evidence in the light most favorable to the verdict and assumes that the fact finder believed the state's witnesses and disbelieved any contrary evidence."). We will not reverse a conviction if, "giving due regard to the presumption of innocence and the prosecution's burden of proving guilt beyond a reasonable doubt, the jury could have found the defendant guilty of the charged offense." *Leake,* 699 N.W.2d at 319; *accord Sanchez–Diaz,* 683

---

ny of Guy's involvement in a similar crime and the testimony of two boys that they saw Guy with Archer and LeMon and that the men stopped talking when the boys entered the room—both affirm the truth of Archer's testimony and point to Guy's guilt in the check-cashing scheme. But there is no indication in *Guy* that Archer testified about the check-cashing incidents involving the illiterate witness, so this evidence could not affirm the truth Archer's testimony. And although the boys' testimony confirmed part of Archer's account, we do not see how testimony that Guy was talking to Archer and LeMon about some unknown topic could, by itself, point to Guy's involvement in a check-cashing scheme. Yet, despite the fact that no piece of evidence, by itself, satisfied both corroboration requirements, we looked at the evidence as a whole and held that it was sufficient to corroborate Archer's testimony. *Id.* at 72, 105 N.W.2d at 897.

N.W.2d at 831 ("When reviewing a claim of insufficient evidence, this court's inquiry is limited to whether the fact finder could have reasonably concluded that defendant was guilty beyond a reasonable doubt."). We have said that "[c]ircumstantial evidence is entitled to the same weight as any other evidence," but in order to sustain a conviction, the circumstances proved must be "consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis other than guilt." *Leake,* 699 N.W.2d at 319; *see also State v. Johnson,* 173 Minn. 543, 545–46, 217 N.W. 683, 684 (1928).

The first count for which the jury found Clark guilty is aiding and abetting first-degree premeditated murder. A person is liable for aiding and abetting a crime if he "intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." Minn. Stat. § 609.05, subd. 1 (2006). In order to prove aiding and abetting, the State has to prove that the defendant had knowledge of the crime and "intended his presence or actions to further the commission of that crime." *State v. Mahkuk,* 736 N.W.2d 675, 682 (Minn.2007).

The jury also found Clark guilty of conspiracy to commit first-degree premeditated murder. A person is guilty of conspiracy if he "conspires with another to commit a crime and in furtherance of the conspiracy one or more of the parties does some overt act in furtherance of such conspiracy." Minn.Stat. § 609.175, subd. 2 (2006). In order to prove conspiracy, the State's evidence must "objectively indicate[ ] an agreement" between the defendant and another person to commit a crime. *State v. Hatfield,* 639 N.W.2d 372, 376 (Minn.2002).

██ The State's theory of Officer Sackett's murder is that on the night of the shooting, Reed and Clark walked to Clark's house, where they stored the murder weapon. Reed then picked up Trimble, drove her to the public telephone booth where she made the false emergency call to lure a police officer to the scene, and then returned to Clark's house. Either Reed or Clark retrieved the murder weapon, left the house, and shot Sackett. The shooter then returned to the house, and Reed drove Trimble home.

At Clark's trial, Arthur Harper testified that Reed was seen carrying a rifle and walking with Clark toward Clark's house approximately one-half hour before Officer Sackett's murder. Voice-print analysis showed that, shortly before the shooting, Trimble made a false emergency call from a public telephone booth on the corner of Victoria Street and Selby Avenue. According to Trimble's testimony,[5] Reed then drove her to Clark's house, which was only one block away. When they arrived, Clark was standing outside waiting to meet them. Although Trimble testified that she did not see either Reed or Clark leave the house, her grand jury testimony indicated that she went into the house to use the restroom and that the two men could have left the house during that time. Trimble also testified that she did not see a rifle in the car.

The State's evidence showed that Officer Sackett was shot with a 30–caliber, bolt-action rifle, that Reed and Clark had been

5. In determining whether the evidence presented at Clark's trial was sufficient to support the jury's verdicts, the dissent does not consider Trimble's testimony because it concludes that no reasonable jury could have found that her testimony was corroborated. But as previously discussed above, we conclude that a reasonable jury could have found that her testimony was corroborated and used that evidence to determine whether Clark was guilty beyond a reasonable doubt. Therefore, we consider Trimble's testimony in determining whether the evidence was sufficient to support the jury's verdicts.

seen in possession of a similar weapon on multiple occasions in the months before the murder, that Clark's house was located approximately 102 yards from the murder scene, which is within the range of a rifle like that used in the murder, and that Clark's house was located in the general direction from where the fatal shot was fired. Finally, the State's evidence showed that Reed and Clark were close friends and that they shared a common motive for the shooting—Reed had previously advocated killing a police officer as part of an attempt to bring a Black Panther chapter to Saint Paul, and Clark had openly agreed with those views.

The dissent concludes that Harper's testimony that he saw Reed carrying a rifle and walking with Clark before the shooting is not sufficient to support a conviction. It reaches this conclusion based on the fact that, because "Reed and Clark had been seen together on a number of occasions with a rifle in their possession without anyone being shot, it is equally possible to infer that Clark did not know of Reed's plan to shoot a police officer that evening." The dissent also states that "[t]here is no available evidence placing Clark and Reed together again that night. Nor is there evidence placing Clark at or near the scene of the shooting at the time of or after the shooting." Therefore, the dissent asserts that "it cannot be said that the fact that Reed and Clark were seen together with a rifle the night Officer Sackett was shot leads unerringly to the conclusion that an agreement to conspire existed between Reed and Clark."

The dissent is correct when it asserts that the fact that Reed and Clark were seen together with a rifle in Reed's possession one-half hour before the shooting would not be sufficient to support either an aiding and abetting or a conspiracy conviction. But we conclude that Trimble's testi-

mony is sufficient to fill the gaps in the chain of evidence pointing to Clark's involvement with Reed in a plan to shoot a police officer. Trimble's testimony places Reed and Clark together in the area where the fatal shot was fired and, if the jury credited her grand jury testimony, this gave the two men an opportunity to commit the crime. Trimble's testimony also leads to an inference that Reed and Clark had arranged to meet behind Clark's house after the false emergency call was placed, and that the two men had stored the murder weapon at Clark's house before the false emergency call or the shooting. Viewing the evidence in the light most favorable to the verdict, we conclude that a reasonable jury could have found beyond a reasonable doubt that Reed and Clark agreed to murder a police officer and that Clark's actions were intended to further the commission of that crime. Accordingly, we conclude that the evidence presented at Clark's trial when viewed in a light most favorable to the State was sufficient to support the jury's verdicts of aiding and abetting first-degree premeditated murder and conspiracy to commit first-degree murder.

*Remedy*

■ Having concluded that the district court committed plain error when it failed to instruct the jury on accomplice testimony, that Clark was substantially prejudiced by the error, and that the evidence is sufficient to corroborate Trimble's testimony and to support the jury's verdicts, the appropriate remedy is to remand for a new trial.

### III.

■ Because several of the remaining issues raised by Clark on appeal are likely to recur upon retrial, we address these issues to offer guidance to the district court and in the interest of preserving

judicial resources. Clark asserts the district court erred when it instructed the jury that the State was not required to prove that Clark aided and abetted or was aided and abetted by or conspired with Reed as set out in the grand jury's indictment. With respect to aiding and abetting, the indictment read:

On or about the 22nd day of May 1970, in Ramsey County, Minnesota, the defendants, Ronald Lindsey Reed and Larry Larue Clark, aiding and abetting and being aided and abetted by each other, did wrongfully and unlawfully cause the death of James Sackett, with premeditation and with the intent to cause the death of James Sackett or another person.

With respect to the conspiring, the indictment read:

On or about the 22nd day of May 1970, in Ramsey County, Minnesota, the defendants, Ronald Lindsey Reed and Larry Larue Clark, did wrongfully and unlawfully conspire with each other to commit the crime of Murder in the First Degree, and in furtherance of this conspiracy, one of the defendants, did an overt act, namely caused another to make a telephone call designed to summon one or more police officers to a particular location.

With respect to aiding and abetting, the district court instructed the jury on the accomplice charge that the State needed to prove Clark aided and abetted "with another or otherwise procured the commission of a crime by another person, whether or not that person is named in the indictment or event identified." With respect to the conspiracy charge, the court instructed the jury that the State needed to prove that "the defendant conspired with at least one other person to commit the crime of murder in the first degree." The court further instructed that, "It makes no difference whether that person is named in the indictment. You do not have to find that the other person charged in the indictment was a member of the conspiracy." Clark objected only to the instruction related to the accomplice offense but argues that we can remedy the plain error resulting from the instruction given for the conspiracy offense as well.

We addressed this issue in *Reed* when we considered and rejected Reed's challenge to the same jury instructions that were given at his trial. *See Reed,* 737 N.W.2d at 584. Clark argues that the issue is different in his case because he, unlike Reed, put on a defense at trial. According to Clark, part of his defense involved calling 21 witnesses to show that his friendship with Reed was not as close as alleged by the State. Clark claims that the change in jury instructions gave him no chance to respond to the argument that he may have been an accomplice or a co-conspirator with someone other than Reed, in violation of his due process rights. Clark, like Reed, relies on a Rhode Island Supreme Court case, *State v. DeSanto,* 603 A.2d 744, 746 (R.I.1992), to support his proposition that the joint indictment made the identity of his co-conspirator or accomplice an essential element of the offense. We rejected the Rhode Island case in *Reed* as neither binding on our court nor persuasive. *Reed,* 737 N.W.2d at 580.

In *Reed,* we determined that Reed did not show how the change in jury instruction language prejudiced him and concluded there was no reversible error in the instructions. *Id.* at 581. As we stated in *Reed,* "[w]e cannot see how his defense would have changed had the indictment included unnamed co-conspirators from the outset." *Id.* The State presented little or no evidence at trial connecting Clark to a co-conspirator or accomplice other than Reed. Clark has not shown how his de-

fense at trial would have changed if he had been on notice from the outset that his conspiracy charge might include unnamed co-conspirators. Accordingly, we fail to see how the jury instructions prejudiced Clark. On the facts before us, we conclude the district court's jury instructions on aiding and abetting and on conspiracy do not constitute reversible error.

### IV.

Finally, Clark argues that it was error for the district court to admit as *Spreigl* evidence his 1971 conviction for the Omaha bank robbery.[6] He claims the conviction is irrelevant because it bears no relationship to the charged offenses. Further, he argues that the probative value of the evidence is outweighed by the potential for unfair prejudice.

The State responds that the district court reserved its decision until the end of the State's case and then found the conviction admissible for the limited purposes of proving intent and motive. The State also argues that any potential prejudicial effect was minimized by the limited evidence of the robbery actually presented to the jury and by the court's cautionary instruction that was more restrictive than the standard CRIMJIG 3.16.[7] The State also asserts the evidence was "crucial" to its otherwise "largely circumstantial case" that relied primarily on Clark's intent.

 We review evidentiary rulings for an abuse of discretion. *State v. Kennedy*, 585 N.W.2d 385, 389 (Minn.1998). Generally, evidence is admissible only if it is relevant. Minn. R. Evid. 402. Evidence of a defendant's other crimes or wrongs usually is inadmissible to prove the defendant's character. Minn. R. Evid. 403, 404(b). Other-crimes evidence may be admissible for limited purposes: to show motive, intent, absence of mistake, identity, or common plan or scheme. Minn. R. Evid. 404(b); *State v. Gomez*, 721 N.W.2d 871, 877 (Minn.2006). For such evidence to be admissible (1) the State must provide notice of its intent to use the evidence; (2) the State must clearly indicate what the evidence is being offered to prove; (3) there must be clear and convincing evidence that the defendant participated in the other act; (4) the *Spreigl* evidence must be relevant and material; and (5) the probative value of the evidence must not be outweighed by the potential prejudice. *State v. Ness*, 707 N.W.2d 676, 685–86 (Minn.2006). If it is "a close call" whether

---

6. Evidence of other crimes or bad acts by a defendant offered for the limited purpose of showing motive, intent, absence of mistake, identity, or a common scheme or plan is commonly referred to as *Spreigl* evidence after our decision in *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965). *State v. Blanche*, 696 N.W.2d 351, 377 n. 10 (Minn. 2005); *see also* Minn. R. Evid. 404(b).

7. The standard CRIMJIG 3.16 specifies the evidence is "admitted for the limited purpose of assisting you in determining whether the defendant committed those acts with which the defendant is charged." 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 316 (5th ed.2006). The trial court in Clark's case instructed the jury:

You may not use this evidence to decide whether the defendant carried out the acts involved in the crimes charged here. However, if you are convinced beyond a reasonable doubt based on other evidence introduced ... that the defendant did carry out the facts involved in the crime charged here, then you may use this evidence concerning a subsequent act to decide the defendant's intent or motive. Remember, even if you find that the defendant may have committed a subsequent offense on a different occasion, this is not evidence that he committed such an act in this case. You may not convict a person simply because you believe he may have committed another offense on a different occasion.

the evidence should be admitted, the *Spreigl* evidence should be excluded. *Id.* at 685.

 In *Ness*, we indicated that the district court "should not simply take the prosecution's stated purposes for the admission of other-acts evidence at face value." *Id.* at 686. The court should " 'look to the real purpose for which the evidence is offered,' and ensure that the purpose is one of the permitted exceptions to the rule's general exclusion of other-acts evidence." *Id.* In this case, the State asserts that the "evidence goes to intent," arguing that Clark intentionally shot to kill, wound, or maim during the robbery, which evidence was offered to prove that Clark had the specific intent to kill a police officer.[8]

We do not see how the intent involved in the bank robbery proves intent in killing an officer. The intent to kill a police officer in order to bring a Black Panther Party chapter to Saint Paul is different from the intent involved in returning fire during a bank robbery when the criminal objective is to commit a robbery and facilitate an escape. Admitting the evidence on the basis of intent was improper.

 The question of whether the bank robbery conviction was admissible to prove motive also was presented to the district court. Clark disputed any connection between the bank robbery and the United Black Front's activities to raise money for the Black Panther Party and asserts that no evidence in the record supports the State's argument. He contends that the court erred in admitting the evidence based on motive.

We conclude that the *Spreigl* evidence was admissible for the limited purposes of showing absence of mistake or identity as joint actors. In *State v. Nelson*, we concluded that *Spreigl* evidence in that case was relevant to show that the defendant and his accomplice "worked together closely to coordinate their criminal activity." 632 N.W.2d 193, 204 (Minn.2001). We noted the other-crimes evidence was important to the State's case "because it was not only material but also the most relevant evidence" of the accomplice relationship. Given the circumstantial nature of the evidence linking Clark to Officer Sackett's murder and the credibility issues raised with respect to the witnesses providing that circumstantial evidence, evidence that Reed and Clark worked together during the bank robbery supports the State's contention that they worked together in killing Sackett.

Moreover, any concerns we might have had over the potential for prejudice are minimized due to the district court's cautionary instruction to the jury regarding the permissible use of *Spreigl* evidence. We presume that jurors follow the court's instructions. *State v. Budreau*, 641 N.W.2d 919, 926 (Minn.2002); *see also Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). Thus, the court's detailed instruction to the jury limited the potential for prejudice and mitigated any possibility that the evidence of Clark's bank robbery conviction suggested he had a propensity to commit criminal acts. On the admissibility of the *Spreigl* evidence, we conclude that Clark is not entitled to any relief.

Reversed and remanded for a new trial.

MAGNUSON, C.J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

---

**8.** The State made the following argument to the district court: "This is a case where the state has to prove that the murder of Officer Sackett was committed; not only committed but committed intentionally. This evidence goes to intent."

DIETZEN, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

PAGE, Justice (dissenting).

## DISSENT

I respectfully dissent.

While I agree with the court that Clark's conviction must be reversed, I believe the court's decision to remand for a new trial is error. My review of the record leads me to the conclusion that the corroborating evidence relied on by the court is insufficient as a matter of law and therefore may not be used to support Clark's conviction. Because I further conclude that the remaining evidence, absent the accomplice testimony, is legally insufficient to support Clark's conviction, I would reverse Clark's conviction outright and not remand for a new trial.

Clark claims that his conviction should be reversed and that he should receive a new trial because Trimble was an accomplice whose testimony at trial was not corroborated. Clark did not request an accomplice instruction nor did he object to the admission of her testimony on those grounds. When a defendant fails to object to a trial court's erroneous omission of a jury instruction regarding accomplice testimony, our review is for plain error. *State v. Reed,* 737 N.W.2d 572, 584 (Minn. 2007). For there to be plain error, the trial court must have committed (1) an error, (2) that was plain, and (3) that affected the defendant's substantial rights. *State v. Ramey,* 721 N.W.2d 294, 298 (Minn.2006). If each of these factors of

the plain error test is met, we then consider the additional factor of whether the unobjected-to error needs to be addressed to ensure fairness and the integrity of the judicial process. *Id.* at 302. An error is considered "plain" if it is "clear" or "obvious." *State v. Strommen,* 648 N.W.2d 681, 688 (Minn.2002) (citing *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). If the error "contravenes case law, a rule, or a standard of conduct," it usually is clear or obvious. *Ramey,* 721 N.W.2d at 302. Generally the defendant bears the burden of persuasion on the third factor. *Olano,* 507 U.S. at 734, 113 S.Ct. 1770; *Ramey,* 721 N.W.2d at 301–02.

A conviction may not rest on uncorroborated accomplice testimony because such testimony is "inherently untrustworthy." *Strommen,* 648 N.W.2d at 689; *see also* Minn.Stat. § 634.04 (2006). Therefore, a trial court has a "duty to instruct juries on accomplice testimony in any criminal case in which it is reasonable to consider any witness against the defendant to be an accomplice." *Strommen,* 648 N.W.2d at 689. The "test for determining whether a witness is an accomplice for purposes of section 634.04 is whether he could have been indicted and convicted for the crime with which the accused is charged." *State v. Lee,* 683 N.W.2d 309, 314 (Minn.2004).

The corroborating evidence does not have to be sufficient to support a conviction, but it must both (1) "affirm the truth of the accomplice's testimony" and (2) "point to the guilt of the defendant in some substantial degree." [1] *Reed,* 737

---

1. We have stressed that "[t]he connection between the defendant and the crime must be established by corroborating evidence which affirms the truth of the accomplice's testimony and points to the guilt of the defendant in some substantial degree." *State v. Mathiasen,*

267 Minn. 393, 398, 127 N.W.2d 534, 538 (1964). The court appears to read the statement to mean that an accomplice's testimony is corroborated if there is at least one piece of evidence pointing to the truth of the testimony and at least one other piece of evidence point-

N.W.2d at 584 (quoting *State v. Sorg*, 275 Minn. 1, 5, 144 N.W.2d 783, 786 (1966)). Circumstantial evidence "indicating the defendant's participation in the crime is sufficient to corroborate the accomplice's testimony." *State v. Bowles*, 530 N.W.2d 521, 532 (Minn.1995) (citing *State v. Jones*, 347 N.W.2d 796, 800 (Minn.1984)). A defendant's "entire conduct" may be looked to for corroborating circumstances. *State v. Adams*, 295 N.W.2d 527, 533 (Minn.1980). The "quantum of corroborative evidence needed necessarily depends on the circumstances of each case." *Id.* Although we review the corroborating evidence in the light most favorable to the verdict, *State v. Johnson*, 616 N.W.2d 720, 727 (Minn.2000), whether the evidence *sufficiently* corroborates the accomplice's testimony is a legal question that we review de novo. *See, e.g., id.* (concluding that the accomplice testimony was sufficiently corroborated and pointed to the defendant's guilt); *Adams*, 295 N.W.2d at 534 (concluding that the accomplice testimony was adequately corroborated); *State v. Mathiasen*, 267 Minn. 393, 401–02, 127 N.W.2d 534, 540 (1964) (concluding that the accomplice testimony was not adequately corroborated).

In *Reed*, we concluded that Trimble was an accomplice as a matter of law and that the admission of her testimony at trial without giving the jury an accomplice in-

struction was error that was plain. 737 N.W.2d at 582–83. For all of the reasons discussed in *Reed*, Trimble is also an accomplice as a matter of law in this case. As such, the trial court here committed an error, which was plain, when it failed to give an accomplice instruction. We further concluded in *Reed*, however, that the failure to give the accomplice instruction did not affect Reed's substantial rights "[g]iven the extent of corroborating evidence in the record." *Id.* at 584–85. In reaching that conclusion, we looked at "the weight of [the non-accomplices'] collective testimony." *Id.* at 585. Notably, at Reed's trial, Garrett, a trained sharpshooter, testified that Reed tried to recruit him for help in "bringing down the first pig"; Trimble testified that she and Reed made the call; Foster testified that Reed's behavior shortly after the shooting was dejected and abnormal; and John Griffin testified that, in the early 1980s, Reed told him that "when [Reed] put a bead on that officer ... he felt powerful," but "when he seen the bullet hitting him, he said he never felt more f[* * *]ed up in his life." *Id.* at 578–79, 585 (third alteration added).

At Clark's trial, Trimble testified that, at Reed's request, she placed the false emergency phone call on the night Officer Sackett was shot. Her testimony also placed

---

ing to the defendant's guilt. However, we also have said that the "proper test" for determining whether evidence corroborates an accomplice's testimony is "whether it tends in some reasonable degree to confirm the truth of the accomplice's testimony *as to* defendant's guilt." *State v. LaJambe*, 300 Minn. 539, 541, 219 N.W.2d 917, 919 (1974) (emphasis added).

Other than *State v. Guy*, 259 Minn. 67, 105 N.W.2d 892 (1960), the court has identified no cases that use one piece of evidence to affirm the truth of the accomplice's testimony and another piece of evidence that points to the defendant's guilt. Nor have I found any such cases. As for *Guy*, as explained in some

detail later, that case involved accomplice testimony corroborated by evidence from at least two non-accomplices that affirmed the truth of the accomplices' testimony as to the defendant's guilt.

Finally, in the absence of case law to the contrary, I note that the policy underlying the rule requiring corroboration of accomplice testimony is not furthered by the court's reading of our accomplice corroboration rules. Merely requiring that the truth of some part of the accomplice's testimony be affirmed and that some other evidence point to the defendant's guilt hardly "restores confidence" in the accomplice's testimony. *See State v. Houle*, 257 N.W.2d 320, 324 (Minn.1977).

Clark both at his home, which was approximately 102 feet from where Officer Sackett was shot, and in Reed's company around the time of the shooting. Further, she testified that she did not see a rifle at Clark's house or in the car when Reed drove her to the phone booth and to Clark's house. Trimble also claimed that Clark was waiting outside for them when she and Reed arrived at Clark's house.

Although on the surface the voice print analysis evidence seems to corroborate Trimble's testimony that she made the false emergency call, the voice print analysis lacks any probative value on the issue of whether Trimble's testimony was truth-

ful because she only admitted making the telephone call after the police confronted her with the voice print analysis. The fact that Trimble conceded a fact proven by independent tangible evidence can hardly be said to establish truthfulness. In addition, that evidence does not directly or circumstantially corroborate her claim that Reed asked her to make the call or any of her other testimony.[2] Nor does it point to Clark's guilt to any degree, substantial or otherwise.

Even when viewed in a light most favorable to the verdict, none of the evidence affirms the truth of Trimble's testimony that there was no rifle in car, that she and

**2.** Contrary to the court's assertion, I would not require "the introduction of independent evidence to prove every aspect of the accomplice's testimony that is probative of the defendant's guilt." I would only require, as we have in the past, that the corroborating evidence affirm at least *some aspect* of the truth of the accomplice's testimony that is probative of the defendant's guilt. In this case, there is no corroborating evidence affirming any aspect of the truth of Trimble's testimony that is probative of Clark's guilt. The only non-accomplice evidence that arguably points to Clark's guilt, although I do not concede that it does, is the testimony that Clark was seen with Reed and a rifle shortly before the shooting. However, that piece of evidence, like all of the other non-accomplice evidence, in no way points to or affirms the truthfulness of any of Trimble's testimony; it does not affirm the truth of her testimony about making the call for Reed, not seeing the rifle in the car or Clark's house, Clark waiting outside his house, or that she and Reed even went to Clark's house the night of the shooting. Here, there is simply no evidence that is both probative of Clark's guilt while at the same time probative of the truthfulness of Trimble's testimony.

The court relies on *State v. Guy*, 259 Minn. 67, 105 N.W.2d 892 (1960), to support its claim that our precedent requires "that the evidence *as a whole* must both affirm the truth of the accomplice's testimony and point to the defendant's guilt." The court's reliance on *Guy* is misplaced and the court's argument

overreaches. In *Guy*, other-crimes evidence of a markedly similar check-cashing offense involving Guy, which was testified to by an "illiterate" witness who was not an accomplice to the charged offense, both affirmed the truth of the accomplice Archer's testimony *and* pointed to Guy's guilt, contrary to the court's conclusion here. *Id.* at 70, 105 N.W.2d at 895–96. Also in *Guy*, while the testimony of the 11–year–old child witness was impeached, and the impeached testimony could not be used as substantive evidence of proof, it could nonetheless be used to provide corroboration of Archer's testimony. *Id.* at 72–73, 105 N.W.2d at 897; *see also State v. Pippitt*, 645 N.W.2d 87, 94 (Minn.2002) (holding that jury could use impeached witness testimony to corroborate an accomplice's testimony). The 11–year–old's testimony that he saw Guy with Archer and LeMon, that the three men stopped talking when he entered the room, and that one of the three men told him and his brother to go outside both affirms the truth of Archer's testimony about meeting with Guy and points to Guy's involvement in the check-cashing scheme. Although the court contends that the other-crimes testimony and the child's testimony do not both affirm the truth and point to Guy's guilt, they do when one considers them in light of all of the other evidence admitted against Guy. Thus, in *Guy*, looking at the evidence "*as a whole*," accomplice Archer's testimony was corroborated by non-accomplice testimony, which affirmed the truth of Archer's testimony as to Guy's guilt.

Reed drove to Clark's house after she made the phone call, and that Clark was standing outside his back door when they arrived. The evidence includes testimony: (1) that Clark was present at group meetings at which Reed advocated killing a police officer; (2) that Clark apparently agreed with Reed's statements about killing a police officer, self-defense, and black power; (3) that Clark made statements about black power and self-defense; and (4) that Clark had a close relationship with Reed. None of this evidence in any way affirms the truth of Trimble's testimony, nor does it point to Clark's guilt except to the extent it raises the improper inference of guilt by association.

In addition, there was evidence that Clark and Reed were involved in the shooting of a police officer during the Nebraska bank robbery and that there was a false emergency call summoning police to 867 Hague Avenue two days before the shooting of Officer Sackett at 859 Hague. This evidence does not in any way affirm the truthfulness of any of Trimble's testimony.

There was also evidence that Clark was seen shortly before the shooting walking with Reed, who was carrying a rifle, in the direction of Clark's house and the location of the shooting. This evidence does not affirm the truth of any of Trimble's testimony. Indeed, notwithstanding the State's argument and the court's conclusion to the contrary, this evidence sheds no light on that testimony. On these facts, the use of what was seen by Harper to corroborate the testimony of Trimble about what was not seen by Trimble at a different time and in a different place for the purpose of supporting an inference to be drawn from Trimble's testimony creates

an impossible hurdle for a criminal defendant to overcome. As there is no way for Clark to challenge what Trimble did not see, there is essentially no way to challenge the inference the State would have drawn from that evidence.

Additionally, it is worth noting, although certainly not dispositive, that none of the evidence relied on by the State puts Clark at home or with Reed *at the time of the shooting* or suggests that the rifle seen earlier was not in the car used in driving Trimble to make the phone call.[3] Thus, the evidence relied on does not either directly or circumstantially "affirm the truth" of Trimble's testimony that there was no rifle in the car, that she and Reed drove to Clark's house after she made the phone call, and that Clark was standing outside his back door when they arrived.

Nor does any of the evidence when viewed in a light most favorable to the verdict point to Clark's guilt in some substantial degree. The court contends that the evidence "plac[es] the men in proximity to the crime scene under unusual circumstances." *See Sorg*, 275 Minn. at 5, 144 N.W.2d at 786 (emphasis added). Here, while Harper claimed that he saw Reed and Clark walking toward Clark's house, that is hardly an unusual circumstance. In addition, the record contains evidence that it was not unusual for Reed and Clark to be seen together with a rifle present. While there is considerable evidence that Clark associated with Reed, none of this evidence suggests Clark jointly participated in, or even was aware of, a plan to shoot Officer Sackett on May 22, 1970. Further, although there is evidence Reed possessed a rifle, no one ever testified that Clark was in possession of the

---

**3.** The court, without explanation, asserts that the truthfulness of Trimble's testimony is affirmed by the other evidence. Making the assertion, however, does not turn the assertion into fact.

rifle used to commit the offense, much less any other rifle on the day in question.

Because I believe, as a matter of law, that Trimble's testimony lacks corroboration, I conclude that Clark's conviction cannot rest on that testimony. Given the nature of the remaining evidence, I also conclude that the failure to give the accomplice instruction affected Clark's substantial rights and that fairness and the integrity of the judicial process require reversal of Clark's convictions.

Even though none of the evidence discussed above both affirms the truth of Trimble's testimony and at the same time points to Clark's guilt in some substantial degree, the court concludes that a reasonable jury could conclude that Trimble's testimony is corroborated. In essence, the court has concluded that there is sufficient evidence in the record to corroborate Trimble's testimony, a conclusion with which I obviously disagree.[4] Notwithstanding that conclusion, the court correctly concludes that reversal of Clark's conviction is required because the trial court's failure to give an accomplice instruction was plain error.

Having concluded that Clark's convictions must be reversed, the next question is whether we should remand for a new trial. The court concludes that we should. The answer to that question for me turns on whether, absent Trimble's testimony, there is otherwise sufficient evidence to sustain Clark's convictions. The general

rule is that the Fifth Amendment's Double Jeopardy Clause, made applicable to the states through the Fourteenth Amendment, does not bar the retrial of a defendant who has been successful in having his or her convictions set aside for error in trial proceedings. *Lockhart v. Nelson*, 488 U.S. 33, 38, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988) (citing *United States v. Ball*, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896); *United States v. Tateo*, 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964)). An exception to that general rule was recognized in *Burks v. United States*. 437 U.S. 1, 18, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). In *Burks*, the Court held that retrial is barred when the sole basis for the reversal is insufficiency of the evidence. *Id.* In holding that double jeopardy does not bar retrial of a defendant whose conviction is overturned because of ordinary trial errors, the Court in *Lockhart* noted that the Court in *Burks*

> was careful to point out that a reversal based solely on evidentiary insufficiency has fundamentally different implications, for double jeopardy purposes, than a reversal based on such ordinary "trial errors" as the "incorrect receipt or rejection of evidence." 437 U.S. at 14–16, 98 S.Ct. 2141. While the former is in effect a finding "that the government has failed to prove its case" against the defendant, the latter "implies nothing with respect to the guilt or innocence of the defendant," but is simply "a determination that [he] has been convicted

4. In order to reach this conclusion, it appears that the court has retreated on our longstanding requirement that in order for evidence to corroborate an accomplice's testimony it must have both some tendency to affirm the truth of the accomplice's testimony and at the same time point to the defendant's guilt. *See Sorg,* 275 Minn. at 5, 144 N.W.2d at 786. As applied by the court in this case, the rule only requires that the evidence have some tendency to affirm the truth of the accomplice's

testimony *or* point to the defendant's guilt. Thus, for the court to conclude that an accomplice's testimony is sufficiently corroborated, it is enough if there are two pieces of evidence, one of which affirms the truth of the accomplice's testimony but does not point to the defendant's guilt, and the other of which points to the defendant's guilt but does not affirm in any way the truth of the accomplice's testimony.

through a judicial *process* which is defective in some fundamental respect." *Id.* at 15, 98 S.Ct. 2141.

*Lockhart,* 488 U.S. at 40, 109 S.Ct. 285 (citing *Burks,* 437 U.S. at 14–16, 98 S.Ct. 2141).

The trial error here was the failure to give the accomplice testimony instruction, which explains in relevant part that the jury

cannot find the defendant guilty of a crime on the testimony of a person who could be charged with that crime, unless that testimony is corroborated by other evidence that tends to convict the defendant of the crime. Such a person who could be charged for the same crime is called an accomplice.

10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 3.18 (5th ed.2006). On the surface, this error would appear to be the kind of ordinary trial error for which retrial would not be barred by double jeopardy. But the trial court's failure to give an accomplice instruction is not the only problem with the accomplice testimony. While it is true that the failure to give the instruction is an ordinary trial error, there is the further problem that as a matter of law Trimble's testimony is not sufficiently corroborated so as to be available to support Clark's conviction. Because Trimble's testimony is unavailable to support the conviction, we are left with a question of evidentiary sufficiency. That question is the same question we would have to confront if the accomplice instruction had been properly given, the defendant had

been convicted, and on appeal we held that the accomplice testimony was insufficiently corroborated and therefore unavailable to support the conviction. Thus, under *Burks,* we must determine whether the available evidence as a whole is sufficient as a matter of law to affirm the conviction. For the reasons discussed below, I conclude that the evidence is not sufficient to sustain the conviction, and therefore outright reversal of Clark's conviction is required.[5]

When reviewing sufficiency of the evidence claims, our review is "limited to a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach their verdict." *State v. Hatfield,* 639 N.W.2d 372, 375 (Minn.2002). We give circumstantial evidence the same weight we give any other kind of evidence. *Bernhardt v. State,* 684 N.W.2d 465, 477 (Minn. 2004). However, "if a conviction is based on circumstantial evidence, a higher level of scrutiny is warranted." *Id.* Like convictions based on other types of evidence, a conviction based on circumstantial evidence will be affirmed so long as "the circumstances are both consistent with the hypothesis that the defendant is guilty and inconsistent with any rational hypothesis except that of guilt." *Hatfield,* 639 N.W.2d at 376 (citing *State v. Walen,* 563 N.W.2d 742, 750 (Minn.1977)). That is, the circumstantial evidence must " 'form a complete chain which, in light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a

---

**5.** Clark does not claim, nor do I conclude, that Trimble's testimony was inadmissible. I simply concluded that, under the facts of this case, Trimble's testimony was not, as a matter of law, corroborated, and therefore Clark's conviction could not rest on her testimony even if an accomplice instruction had been given. Therefore, if we were to remand for a

new trial to "merely recreate[ ] the situation that would have been obtained" if the trial court had given the accomplice instruction, the jury would be put in the position of again considering Trimble's uncorroborated accomplice testimony, which it could not use to convict. *See Lockhart,* 488 U.S. at 42, 109 S.Ct. 285.

reasonable doubt, any reasonable inference other than that of guilt.'" *Id.* (quoting *State v. Wahlberg,* 296 N.W.2d 408, 411 (Minn.1980)). We have stated that "the circumstantial evidence must do more than give rise to suspicion of guilt; '[i]t must point unerringly to the accused's guilt.'" *State v. Scharmer,* 501 N.W.2d 620, 622 (Minn.1993) (quoting *State v. Loss,* 295 Minn. 271, 281, 204 N.W.2d 404, 409 (1973)). Mere presence at the crime scene is insufficient evidence from which to infer complicity. *See State v. Mahkuk,* 736 N.W.2d 675, 682 (Minn.2007). Nor is mere association with those who commit a crime sufficient to "raise any rational inference of guilt." *State v. Buchwald,* 293 Minn. 74, 82 n. 4, 196 N.W.2d 445, 450 n. 4 (1972); *see also State v. Varnado,* 582 N.W.2d 886, 890 (Minn.1998) ("mere association" with suspected drug dealer insufficient to support probable cause for being frisked); *State v. Blacksten,* 507 N.W.2d 842, 847 (Minn.1993) ("mere association" with friend near time of robbery insufficient to support probable cause for arrest). The State bears the burden of proving the defendant's guilt on each element of a charged offense beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

*Conspiracy to Commit First–Degree Pre-meditated Murder*

In order to convict Clark of conspiracy to commit first-degree murder, the State was required to prove, among other things, that Clark was part of a conspiracy. Under our law, "[w]hoever conspires with another to commit a crime and in furtherance of the conspiracy one or more of the parties does some overt act in furtherance of such conspiracy" is guilty of conspiracy. Minn.Stat. § 609.175, subd. 2 (2006). To establish a conspiracy, the State must pro-

vide evidence "that objectively indicates an agreement" between the defendant and another to commit the crime. *Hatfield,* 639 N.W.2d at 376. Generally, when there is evidence of "a common plan, concerted conduct, or prior involvement with the alleged co-conspirator," it is reasonable to infer that there was an agreement. *Id.* at 377.

The State's theory of the case at trial was that on the night that Officer Sackett was shot, Reed, along with Clark, followed through with Reed's previously stated desire to kill a police officer. According to the State, Reed, carrying a bolt-action rifle, walked with Clark from Day's apartment to Clark's house, where they stored the rifle. Reed then picked up Trimble and drove her to make the false emergency phone call. Then Reed, along with Trimble, drove to Clark's house to retrieve the rifle, at which point either Reed or Clark or both left Clark's house and carried out the shooting of Officer Sackett. The shooter then returned to Clark's house after which Reed drove Trimble home.

According to the State, the evidence supporting Clark's conspiracy conviction includes evidence:[6] (1) that Clark was present at group meetings at which Reed advocated killing a police officer; (2) of Clark's apparent agreement with Reed's statements about killing a police officer, self-defense, and black power; (3) that Clark made statements about black power and self-defense; (4) that Clark had a close relationship with Reed; and (5) that Clark was seen shortly before the shooting walking with Reed, who was carrying a rifle, in the direction of Clark's house and the location of the shooting. The State also argues that evidence of Clark and

---

**6.** Having concluded, as a matter of law, that Trimble's uncorroborated accomplice testimony is unavailable to support the conviction, I do not consider it here.

Reed's involvement in the shooting of a police officer during the Nebraska bank robbery supports the element of intent. Finally, the State argues that the conspiracy conviction is supported by the evidence of the false emergency call summoning police to 867 Hague Avenue two days before the shooting of Officer Sackett at 859 Hague.

All of the evidence that the State contends supports Clark's guilt is circumstantial. The question that must be answered is whether this circumstantial evidence when viewed in a light most favorable to the verdict points "unerringly" to Clark's guilt. I conclude that it does not. First, the evidence of Clark's presence at United Black Front meetings, his agreement with Reed's statements about killing a police officer, statements of his own about black power and self-defense, and Clark's close relationship with Reed, standing alone, does nothing more than suggest that Clark is guilty because of his association with Reed. Without more, this evidence is insufficient because "mere association with an individual engaged in an illegal enterprise does not make a person a conspirator." *United States v. Moss*, 591 F.2d 428, 435 (8th Cir.1979). Moreover, this evidence does not point unerringly to Clark's guilt or "exclude beyond a reasonable doubt any reasonable inference other than that of guilt."

The strongest evidence against Clark is Harper's testimony that he saw Clark, along with a rifle-carrying Reed, leave Day's apartment walking in the direction of Clark's house and the location of the shooting. The State argues that the inference to be drawn from this evidence is that Reed and Clark were on their way to carry out the shooting. The State further argues that this evidence supports not only an agreement to shoot a police officer, but also action by the two men in furtherance

of that agreement, which goes beyond mere association. However, based on other evidence in the record indicating that Reed and Clark had been seen together on a number of occasions with a rifle in their possession without anyone being shot, it is equally possible to infer that Clark did not know of Reed's plan to shoot a police officer that evening. This inference leads to a rational hypothesis other than guilt. Absent a showing that Clark had knowledge of Reed's plan, an agreement to be part of the plan cannot be inferred. Without other evidence that Clark knew of Reed's plan, the fact that Clark was seen in Reed's company shortly before the shooting becomes mere presence. *See Mahkuk*, 736 N.W.2d at 682. That conclusion is bolstered by the fact that, while there is evidence of Clark being in Reed's company approximately 15 to 30 minutes before Officer Sackett was shot, it is undisputed that Clark and Reed separated after Harper saw them leaving Day's apartment together and there is no available evidence placing Clark and Reed together again that night. Nor is there evidence placing Clark at or near the scene of the shooting at the time of or after the shooting. Indeed, while Reed, Day, Harper, and Garrett were seen immediately after the shooting near the scene, there is no evidence in the record that Clark was seen after Officer Sackett was shot, either with Reed or near the crime scene. Therefore, it cannot be said that the fact that Reed and Clark were seen together with a rifle the night Officer Sackett was shot leads unerringly to the conclusion that an agreement to conspire existed between Reed and Clark.

The State also suggests that Clark's guilt can be inferred from the proximity of Clark's house to 859 Hague, the location where Officer Sackett was shot, and 867 Hague, the location identified to which the police responded as a result of the un-

founded call two days before the shooting of Officer Sackett. Other than establishing that Clark lived in close proximity to those locations, the location of Clark's house, without more, sheds no light on Clark's involvement, if any, in Officer Sackett's shooting. Like mere presence, mere proximity to the crime scene is insufficient to support the inference that Clark conspired with Reed and/or others to carry out the shooting.

Finally, the State asserts that Reed's and Clark's convictions for the Nebraska bank robbery, which occurred five months after Officer Sackett's shooting and during which an off-duty police officer was shot, evidence Clark's intentional involvement in Officer Sackett's shooting. I will assume for purposes of argument that evidence of the bank robbery was properly admitted as *Spreigl* evidence. At trial, the State argued that the evidence that Clark and Reed were convicted of shooting with intent to kill, wound, or maim during the bank robbery was necessary to prove Clark was more than merely present at his house with Reed the night of the shooting. The State also argued that the bank robbery evidence was necessary to rebut suggestions that the State's witnesses lied at trial. The State's theory was that Reed and Trimble did not accidentally go from the phone booth to Clark's house the night Officer Sackett was shot and that Clark was not accidentally waiting outside his house when Reed and Trimble arrived. Given that Trimble's uncorroborated accomplice testimony putting Reed and Clark together at Clark's house near the time of the shooting is, as a matter of law, unavailable to support the conviction, the State's assertion that Clark was intentionally present at his house the night of the shooting is not supported by the record.

To the extent that part of the State's argument was or is that Reed's and Clark's intent to engage in a conspiracy to shoot Officer Sackett can be inferred from the intentional shooting of the police officer during the bank robbery, that argument fails. The fact that Reed and Clark, during a bank robbery, shot a security guard who happened to be an off-duty police officer after the guard attempted to thwart the robbery does not shed light on any agreement that Clark and Reed may have had five months earlier to shoot Officer Sackett for the purpose of obtaining permission to start a local Black Panther chapter. I therefore conclude that Clark's involvement in the bank robbery does not either by itself or in combination with the other evidence provide sufficient evidentiary support for Clark's conspiracy conviction.

### Aiding and Abetting First–Degree Premeditated Murder

As for Clark's conviction for aiding and abetting first-degree premeditated murder, in order for Clark to be convicted of aiding and abetting first-degree murder, the State had to prove that Clark intentionally aided, advised, hired, counseled, or conspired with "or otherwise procure[d] the other to commit the crime." Minn. Stat. § 609.05 (2006). If a defendant plays a "knowing role" in the commission of a crime and [takes] no steps to thwart it, he is guilty of aiding and abetting. *State v. Ostrem*, 535 N.W.2d 916, 924 (Minn.1995). To show that Clark played a knowing role in the shooting, the State had to prove that Clark knew that his accomplice, in this case Reed, was going to shoot Officer Sackett and that Clark "intended his presence or acts to encourage or further the completion of the crime." *Mahkuk*, 736 N.W.2d at 682. Intentional presence at or near the scene of the crime alone is insufficient to support a conviction for aiding and abetting. *Id.*

The evidence the State relies on to support Clark's aiding and abetting conviction is the same circumstantial evidence the State relies on in support of Clark's conspiracy conviction. Again, there is no direct evidence of Clark's involvement in Officer Sackett's shooting. As discussed above, the evidence of Clark's presence at United Black Front meetings, his agreement with Reed's statements about killing a police officer, statements of his own about black power and self-defense, and Clark's close relationship with Reed, standing alone, does nothing more than suggest that Clark is guilty because of his association with Reed and is insufficient to support an inference that Clark played a knowing role in the shooting of Officer Sackett.

Moreover, Harper's testimony that Reed and Clark were seen leaving Day's apartment establishes nothing more than Clark's mere presence in Reed's company some 15 to 30 minutes before the shooting. That evidence does not, however, place Clark in Reed's company at the time of or after the shooting. Nor does it lead unerringly to the conclusion that Clark knew of the plan to shoot a police officer that night or that he played a knowing role in the plan. Further, the record is silent with respect to any action taken by Clark at anytime in furtherance of Officer Sackett's shooting. Finally, for the same reasons discussed above, the Nebraska bank robbery evidence is also insufficient to support the conclusion that Clark played a knowing role in the shooting of Officer Sackett or took any actions in furtherance of that crime.

Having concluded that Trimble's uncorroborated accomplice testimony cannot be used to support Clark's convictions and

that the remaining evidence is insufficient to support Clark's convictions for conspiracy to commit first-degree murder and for aiding and abetting first-degree murder, I conclude that Clark's convictions must be reversed outright. As we stated in *Bernhardt*, on a record with more available evidence to support the conviction than is present here, "[i]f our standard on circumstantial evidence means anything, it means [that, in this case, Clark] cannot be convicted on this record that does not exclude other rational hypotheses." 684 N.W.2d at 479. The same is true here.[7]

---

7. Because I would reverse Clark's convictions, I would not reach the other issues raised by Clark on appeal.