**STATE of Minnesota, Respondent,**

v.

**Edgar Rene BARRIENTOS–
QUINTANA, Appellant.**

**No. A09–1613.**

Supreme Court of Minnesota.

Sept. 9, 2010.

Lori Swanson, Attorney General, St. Paul, MN, and; Michael O. Freeman, Hennepin County Attorney, Michael Richardson, Assistant County Attorney, Minneapolis, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Jessica Merz Godes, Assistant State Public Defender, St. Paul, MN, for appellant.

## OPINION

ANDERSON, G. BARRY, Justice.

A jury found Edgar Rene Barrientos–Quintana guilty of four counts of first-degree murder and four counts of attempted first-degree murder for an October 11, 2008, drive-by shooting in which one young man died and another was injured. The district court records reflect that on each of the first-degree-murder counts, the court sentenced Barrientos–Quintana to life in prison without the possibility of parole. The district court records also reflect that on each of the attempted first-degree murder counts, the court imposed 192–month sentences. Barrientos–Quintana now appeals his convictions, arguing that the district court plainly erred by failing to give a jury instruction regarding accomplice testimony. Barrientos–Quintana also argues that the district court erred by entering convictions and imposing sentences on all eight counts. We affirm in part, vacate in part, and remand.

Barrientos–Quintana was indicted on four counts of first-degree murder for the death of 18–year–old Jesse Mickelson: premeditated murder for the benefit of a gang under Minn.Stat. §§ 609.185(a)(1), 609.229, subd. 2, 609.05 (2008) (count 1); premeditated murder under Minn.Stat. §§ 609.185(a)(1), 609.05 (count 2); murder committed during a drive-by shooting for the benefit of a gang under Minn.Stat. §§ 609.185(a)(3), 609.229, subd. 2, 609.05 (2008) (count 3), and murder committed during a drive-by shooting under Minn. Stat. §§ 609.185(a)(3), 609.05 (count 4). The grand jury also indicted Barrientos–Quintana on four counts of attempted first-degree murder of 15–year–old A.B. Counts 5 through 8, the attempted murder counts, referred to the same statutory sections as counts 1 through 4, with the addition of the attempt statute, Minn.Stat. § 609.17 (2008).

On October 11, 2008, Mickelson was at his Minneapolis home. Mickelson's family was celebrating the thirteenth birthday of Mickelson's cousin, J.G. In the evening as the party was ending, J.G. and a group of other young boys were playing football in the alley behind Mickelson's house. Mickelson briefly joined the game with the children, and then walked across the alley to talk with a group of teenage boys— W.F., A.B., and L.P., the last of whom lived in the house across the alley from Mickelson.

As Mickelson stood talking to the group, a white Dodge Intrepid occupied by three to five men drove into the alley and came to a stop near the group. The occupant of the rear passenger seat fired four to seven shots out of the open window of the car. Mickelson sustained two gunshot wounds to his chest and died at the scene. A.B. received a minor injury to his left calf from a pinhead-sized bullet fragment. 911 calls reporting the shooting were received at 6:53 p.m.

On the night of Mickelson's death, investigating police officers interviewed W.F., A.B., and L.P., among others. None of the three provided a name of a suspect at that time. Six days later on October 17, the police interviewed W.F. for a second time. The interviewing officer suspected that W.F. knew more than he was saying, and in an attempt to convince him to provide more information, the officer showed W.F. a photo of Mickelson and asked W.F. to "speak to Jesse as though he were there and ... tell him instead of [the officer] who actually [com]mitted the crime." W.F. put his head on the table and started crying, and then told the police the shooter was a man named "Smokey." W.F. had a brief confrontation with Smokey outside a store a few weeks before the shooting, but did not know his real name.

The police then assembled a series of six photos, including one of Barrientos–Quintana, whose nickname is Smokey. W.F. identified Barrientos–Quintana as the Smokey who he had seen in front of the store, and wrote "Kinda looks like the Shooter" below the photo. The police located Barrientos–Quintana and arrested him on October 22. On November 6, A.B. also viewed a series of photos. A.B. selected Barrientos–Quintana and stated that Barrientos–Quintana was the shooter.

At trial, A.B. acknowledged having made that selection from the photo lineup but did not make an in-court identification. A.B. testified that immediately after the shootings, he, L.P., and W.F. lied to the police about what they had seen because they did not want to be involved. The group invented a lie about the shooter wearing a bandana over the lower part of his face and sunglasses. Later, though, A.B. said he changed his mind about giving information about the shooter because Mickelson was his friend. A.B. testified that the shooter was seated in the rear passenger seat of a white, four-door car. A.B. said that there were two men in the front and two or three in the back of the car. According to A.B., the shooter was a Latino man with a "shave" or "bald" head, facial hair, and thick eyebrows.

The police also showed a photo lineup to J.G., the boy who had been celebrating his birthday and playing football in the alley. J.G. had stood "two to three feet" from the passenger side of the car as it proceeded through the alley, and J.G. testified at the trial that there were three men in the car—two in the front and one in the rear passenger-side seat. According to J.G., the man in the rear passenger seat was a medium-complected Mexican man with a goatee and not very much hair. J.G. chose someone from the lineup and said he looked similar to the shooter, but was unable to say for certain whether any of the men in the lineup was the shooter.

At trial, J.G. testified that he chose a photo because the man shown "[h]ad really short hair and he had a goatee, and the way it looked, like, it was [the] same skin tone, and that's it." J.G.'s photo lineup was not offered into evidence, and the record does not show whether the person J.G. chose from the lineup was Barrientos–Quintana or someone else.

The police first interviewed Marcelo Hernandez, whose street name is Sharky, on November 14. Hernandez stated dur-

ing that interview and a subsequent interview that he was not involved in Mickelson's murder. Hernandez instead twice told police that someone named "Manny" had admitted to killing Mickelson. On January 30, 2009, during Hernandez's second interview with the police, a sergeant told Hernandez that a "suspect" could end up going to prison, but someone who was only a witness present when the crime was committed would not. Hernandez then told police that he had been present during the shooting. On March 3 during a third interview, just two months before the start of the trial in this case, Hernandez told police that Barrientos–Quintana was the shooter.

At trial, Hernandez testified that he spent the late afternoon of October 11, 2008, riding around in a car with two of his friends, men with the nicknames Slappy and Beaver. The car was a white Dodge Intrepid belonging to Slappy. All three men were members of the Sureños 13 gang. Hernandez said that they were drinking and smoking marijuana when Slappy received a call informing them that there was a party being attended by members of a rival subgroup within Sureños 13. The rival subgroup was South Side Raza (SSR)[1] and its leader was J.P., also known as Puppet. Puppet is the older brother of L.P., one of the witnesses to the crime. The brothers lived in the house across the alley from Mickelson.[2]

Hernandez testified that he, Slappy, and Beaver then made a plan to get a gun, go to the SSR party, and shoot, because they didn't get along with SSR. Slappy then phoned their friend Smokey (Barrientos–Quintana), who agreed to bring a gun and meet them at Powderhorn Park. Hernandez testified that Barrientos–Quintana arrived at the park later, alone in his own car. He carried a gun and got into the rear passenger-side seat of the Dodge Intrepid. Hernandez testified that he was sitting to Barrientos–Quintana's left, in the seat behind the driver. Beaver drove, and Slappy sat in the front passenger seat.

According to Hernandez, Barrientos–Quintana asked who was at the SSR house. One of the occupants of the car told Barrientos–Quintana that his girlfriend, I.C., was there. Hernandez testified that I.C. often associated with SSR members, that it was unusual for a gang member's girlfriend to associate with rival gang members, and that this situation made Barrientos–Quintana jealous. After hearing that I.C. was at the SSR house, Hernandez stated that Barrientos–Quintana wanted to get to the house to shoot.

Hernandez testified that the group of four men then proceeded to the SSR house "to do what we had to do," that is, "[t]o shoot." When asked whether he knew what the group was going to do, Hernandez stated: "I didn't even care because I was high and I didn't even notice what was going on. That's why we did it, because we just acted foolishly." After driving past the front of the house, Hernandez stated that the driver turned off the lights of the car and drove slowly down the alley behind the house and stopped. Hernandez testified that Barrientos–Quintana's window was rolled down. Next, Hernandez said that Barrientos–Quintana fired his gun four or five times. Hernandez stated that at that point, Hernandez "got down on the ground behind the seat." After the

1. According to testimony of various witnesses at trial, several subgroups, called "cliques" or "barrios," are included in the larger gang called Sureños 13. The group SSR has a longstanding conflict with the other subgroups in Minneapolis because SSR formed without permission from gang leadership.

2. Neither J.P. nor L.P. testified at Barrientos–Quintana's trial.

shooting, the group drove away immediately. Another gang member picked them up nearby, and they abandoned the car. Hernandez did not know what happened to the gun.

The State presented a surveillance video showing Barrientos–Quintana and I.C. leaving a Maplewood Cub Foods store at 6:19 p.m. on October 11. The first 911 calls reporting the shooting of Mickelson were received 34 minutes later, at 6:53 p.m. According to the two test drives performed by the police, the drive from Cub Foods to Powderhorn Park, where Hernandez stated that the group picked up Barrientos–Quintana before the shooting, and then to the scene of the murder, took 28 minutes. A private investigator hired by the defense performed the same timed drive and testified that it took 33 minutes. Records from Barrientos–Quintana's cell phone did not show the call that Hernandez testified was made to arrange the plan with Barrientos–Quintana. The records contained no calls made or received on Barrientos–Quintana's phone between 4:37 p.m. and 7:31 p.m. on the day of the shooting.

Barrientos–Quintana did not testify at his trial. Through witnesses, he presented a defense of mistaken identity and alibi. Barrientos–Quintana presented evidence to show that he could not have committed the shooting at 6:53 p.m. on October 11 because he was with his girlfriend I.C. at her family's apartment in Maplewood.

M.C., mother of I.C., testified that around midday on October 11, she, Barrientos–Quintana, and I.C. bought ingredients for a seafood soup. M.C. testified that I.C. and Barrientos–Quintana left the apartment for a while later that day when M.C. was cooking. M.C. testified that they later returned to the apartment with limes from Cub Foods and that I.C. and Barrientos–Quintana ate the seafood soup.

M.C. testified that more than half an hour later, her husband and son arrived at the apartment.

R.C., the brother of I.C., testified that he spent the day of October 11 away from home with his father, and returned to the apartment where he lived with his mother, M.C., and sister, I.C., at about 7:45 p.m. According to R.C., Barrientos–Quintana was at the apartment when R.C. arrived. R.C. said that later that night, he, I.C., and Barrientos–Quintana went to a baptism party. A video from the baptism party shows Barrientos–Quintana and I.C. dancing together. Barrientos–Quintana's hair in the video is thick and dark—much longer than the extremely close haircut he had in the police lineup photo used in this case.

I.C. testified that she was with Barrientos–Quintana the entire day on October 11, including the time of the murder. She testified that around noon, she, her mother M.C., and Barrientos–Quintana went to the store to buy seafood and then went home. According to her testimony, she and Barrientos–Quintana went to visit Barrientos–Quintana's brother in Minneapolis later that afternoon and stayed for about an hour-and-a-half. I.C. testified that she and Barrientos–Quintana went to Cub Foods in Maplewood, and then returned to eat at I.C.'s family apartment at about 6:30. Later that night, I.C., R.C., and Barrientos–Quintana attended a baptism party in Minneapolis. I.C., her mother, and her brother all conceded on cross-examination that they had changed their story to police since Barrientos–Quintana's arrest. They stated that they were initially confused about the date.

Barrientos–Quintana's brother testified that Barrientos–Quintana and I.C. visited him at his home in Minneapolis on the afternoon of October 11. He testified that it was light outside when they arrived and

that the sun was going down when they left.

After deliberating for two days, the jury asked to rehear Hernandez's testimony about the shooting. The district court initially refused the jury's request, but the jury sent another note, stating that the members of the jury were divided—nine for a guilty verdict and "a strong 3" for a not-guilty verdict. Later, the jury asked to receive a specific section of Hernandez's testimony as a means to break the impasse. In response to the difficulty in reaching a unanimous verdict, the district court prepared a transcript of the requested portion of Hernandez's testimony, along with relevant cross-examination and redirect testimony requested by the parties, and read the testimony to the jury on the morning of May 28. Shortly after hearing Hernandez's testimony again, the jury returned a verdict of guilty on all eight counts.

Barrientos–Quintana now appeals his convictions. He argues that he should receive a new trial because the district court did not instruct the jury regarding the statutory requirement for evidence corroborating the testimony of an accomplice. Barrientos–Quintana further argues that the district court erred by entering convictions and imposing sentences on all eight counts.

### I.

Minnesota Statutes § 634.04 (2008) prohibits convictions based on uncorroborated accomplice testimony.[3] We have held that "trial courts have a duty to instruct juries on accomplice testimony in any criminal case in which it is reasonable to consider any witness against the defen-

dant to be an accomplice." *State v. Strommen*, 648 N.W.2d 681, 689 (Minn.2002) (citing *State v. Shoop*, 441 N.W.2d 475, 479 (Minn.1989)). Because of the "very real possibility that the jury could reject corroborating evidence and convict on the testimony of the accomplice standing alone," the court's "duty to instruct on accomplice testimony remains regardless of whether counsel for the defendant requests the instruction." *Id.* (citing *Shoop*, 441 N.W.2d at 481.) The rule "reflects an inherent distrust of testimony from accomplices, who 'may testify against another in the hope of or upon a promise of immunity or clemency or to satisfy other self-serving or malicious motives.' " *State v. Clark*, 755 N.W.2d 241, 251 (Minn.2008) (quoting *Shoop*, 441 N.W.2d at 479). The relevant instruction tells the jury that it "cannot find the defendant guilty of a crime on the testimony of a person who could be charged with that crime, unless that testimony is corroborated by other evidence that tends to convict the defendant of the crime." 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 3.18 (5th ed.2006).

The test for whether a particular "witness is an accomplice is whether the witness could have been 'indicted and convicted for the crime with which the defendant is charged.' " *State v. Pendleton*, 759 N.W.2d 900, 907 (Minn.2009) (quoting *State v. Lee*, 683 N.W.2d 309, 314 (Minn. 2004)). "[T]he witness must have played a knowing role in the crime-the witness's mere presence at the scene is not sufficient." *Id.* (citing *State v. Palubicki*, 700 N.W.2d 476, 487 (Minn.2005)). In cases

---

**3.** The text of Minn.Stat. § 634.04 provides:
A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to

convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

where "it is unclear whether a witness is an accomplice or not, it generally becomes a question of fact for the jury to decide." *State v. Reed*, 737 N.W.2d 572, 582 (Minn. 2007) (citing *State v. Gail*, 713 N.W.2d 851, 863 (Minn.2006)).

 Barrientos–Quintana did not request the accomplice instruction. We therefore review the trial court's failure to give the instruction for plain error. *Clark*, 755 N.W.2d at 251. We have discretion to correct an error not objected to at trial where the error is plain and affects substantial rights. *State v. Taylor*, 650 N.W.2d 190, 205 (Minn.2002); *State v. Griller*, 583 N.W.2d 736, 740 (Minn.1998). A three-prong test applies: "before an appellate court reviews an unobjected-to error, there must be (1) error; (2) that is plain; and (3) the error must affect substantial rights." *Griller*, 583 N.W.2d at 740. An error is "plain" if it is clear or obvious. *State v. Ihle*, 640 N.W.2d 910, 917 (Minn.2002). The third prong of the test "is satisfied if the error was prejudicial and affected the outcome of the case." *Griller*, 583 N.W.2d at 741. Error is prejudicial if there is a "'reasonable likelihood'" that the error "'had a significant effect'" on the jury's verdict. *Id.* (quoting *State v. Glidden*, 455 N.W.2d 744, 747 (Minn.1990)). If any prong of the test is not met, the claim fails. *See id.* at 740. But even if the three prongs of the plain-error test are met, we may only correct the error "if the fairness, integrity, or public reputation of the judicial proceeding is seriously affected." *State v. Morton*, 701 N.W.2d 225, 234 (Minn.2005) (citing *State v. Jones*, 678 N.W.2d 1, 18 (Minn. 2004)).

 Barrientos–Quintana argues that the district court's failure to instruct the jury on the need for corroboration of accomplice testimony was error because Hernandez, by his own testimony, was an accomplice to the crime. The State responds that Hernandez was not an accomplice, but was merely present in the car, under the influence of drugs, without a clear idea of what was transpiring.

 A person who plays "'some knowing role in the commission of the crime'" and "'takes no steps to thwart its completion'" can be held liable as an accomplice. *State v. Ostrem*, 535 N.W.2d 916, 924 (Minn.1995) (quoting *State v. Merrill*, 428 N.W.2d 361, 367 (Minn.1988)). The State focuses on one small piece of Hernandez's testimony, in which he stated that he was high and did not notice what was happening. But the entire exchange makes clear that Hernandez did know exactly what was about to transpire:

> Counsel: [A]fter the Defendant got in Slappy's car, where did you four go?
>
> Hernandez: To the party.
>
> Counsel: Did you talk about what your plan was?
>
> Hernandez: No. *We just went over there to do what we had to do.*
>
> Counsel: What do you mean do what you had to do?
>
> Hernandez: *To shoot.*
>
> Counsel: Did you understand that that was what the group was going to do?
>
> Hernandez: I didn't even care because I was high and I didn't even notice what was going on. That's why *we did it,* because *we just acted foolishly.*"

(Emphasis added.)

Hernandez further acknowledged his knowing role in the commission of the shooting through other statements and actions. Hernandez testified that he, Slappy, and Beaver made the plan together to call Barrientos–Quintana and meet him at Powderhorn Park, then drive to the SSR house for the purpose of shooting someone. Hernandez chose to remain with the

group, knowing that the crime was about to be committed, during the casing of the location, the commission of the shooting, and the flight from the scene and the hiding from the police that occurred afterwards. And when the police eventually questioned him about the shooting, Hernandez lied about his role in the offense until the police assured him that a mere "witness" would not spend time in prison because witnesses are not the same as suspects.

We have found accomplice liability in cases like this one, where the "defendant was present during the criminal activity," "did nothing to prevent the offenses committed," "must have known of the [crime,] and made no effort to stop it." *Ostrem*, 535 N.W.2d at 925 (quoting *State v. Parker*, 282 Minn. 343, 355–56, 164 N.W.2d 633, 641 (1969)). The facts here differ from *State v. Jackson*, 746 N.W.2d 894, 898 (Minn.2008), in which we held that two witnesses were not accomplices primarily because there was "no evidence that [the witnesses] knew [that the defendant] intended to kill [the victim]." And to the extent that the question of Hernandez's accomplice status is close, the district court should have instructed the jury on the accomplice rule and left that question of fact for the jury's determination. *See, e.g., Pendleton*, 759 N.W.2d at 908 (holding that where a witness "could potentially be seen as an accomplice," but the question of knowing participation was "subject to different interpretations," the court correctly gave the accomplice testimony instruction and allowed the jury to decide whether the witness was an accomplice); *Reed*, 737 N.W.2d at 582. The district court therefore erred when it failed to instruct the jury that it could not convict Barrientos–Quintana based on the uncorroborated testimony of an accomplice.

An error is plain if it "contravenes case law, a rule, or a standard of conduct." *State v. Ramey*, 721 N.W.2d 294, 302 (Minn.2006). Because our case law clearly states that the accomplice instruction must be given wherever a witness can reasonably be considered an accomplice, *see, e.g., Strommen*, 648 N.W.2d at 689 (citing *Shoop*, 441 N.W.2d at 479), we conclude that the error here was plain.

To prevail on the third prong of the plain-error test, Barrientos–Quintana "bears the heavy burden of showing" prejudice, which means "there is a reasonable likelihood that [the error] had a significant effect on the jury verdict." *State v. Vance*, 734 N.W.2d 650, 659 (Minn.2007) (internal quotation marks omitted). Keeping in mind the defendant's heavy burden, we now consider the central question in this case. We must decide whether there is a reasonable likelihood that the jury's verdict would have been significantly affected if the jurors had known they could not convict Barrientos–Quintana of murder unless they found that Hernandez's testimony was corroborated by other evidence in the record. Barrientos–Quintana argues that the likelihood that the error affected the jury's verdict is high because the corroborating evidence was weak and the jury might therefore have rejected it. He further argues that the sequence of events during jury deliberations shows that the jury convicted Barrientos–Quintana "based solely on Sharky's testimony." The State asks this court to affirm Barrientos–Quintana's conviction because of the "abundance" of corroborating evidence presented at trial.

We have explained that "corroborating evidence need only be sufficient to restore confidence in the truthfulness of the accomplice's testimony...." *Clark*, 755 N.W.2d at 256. The "evidence need not, standing alone, be sufficient to support a

conviction, but it must 'affirm the truth of the accomplice's testimony and point to the guilt of the defendant in some substantial degree.'" *Reed*, 737 N.W.2d at 584 (quoting *State v. Sorg*, 275 Minn. 1, 5, 144 N.W.2d 783, 786 (Minn.1966)).

Although this is admittedly a close case with respect to the third prong of the plain-error test, we agree with the State that the corroborating evidence was sufficient. Here, Hernandez's testimony was corroborated by identifications from two eyewitnesses. W.F. initially told the police that he did not see the shooter, but he later named Smokey as the shooter. He then made the more tentative statement that Barrientos–Quintana's photo in the lineup "[k]inda look[ed] like the Shooter." W.F.'s possible reasons for initially lying and the tentativeness of his later identification are obvious. W.F. had at least one confrontation with Barrientos–Quintana before Mickelson's murder. And W.F. was associated with SSR, the gang group targeted when Mickelson was shot. The circumstances of W.F.'s initial unambiguous statement that Smokey was the shooter—his tears upon being shown the photo of Mickelson and his immediate identification of Smokey at that point—lend credibility to his testimony. A.B. also initially lied about seeing the shooter's face, but later confidently selected Barrientos–Quintana's photo from a line up.

Barrientos–Quintana argues that the jury's requests to the court during deliberations shows that some of the jurors rejected the corroborating evidence and convicted him solely based on the accomplice testimony. Divided nine to three and unable to reach a unanimous verdict, the jury asked to rehear Hernandez's testimony about the preparation for and commission of the crime. As a matter of chronology, it is accurate to state that once the requested testimony was provided, the jury quickly reached a guilty verdict.

But we reject Barrientos–Quintana's argument that this sequence of events demonstrates that he was prejudiced by the court's failure to give the accomplice instruction. The fact that the jury reached a unanimous guilty verdict after hearing the testimony of Hernandez reread to the jury does not tell us conclusively that those jurors rejected W.F.'s and A.B.'s corroborating testimony. Corroborating evidence need not be enough to lead the jurors to convict without the accomplice testimony; it need only affirm the accomplice's truthfulness—which we know the jury accepted based on its verdict—and point to the defendant's guilt "'in some substantial degree.'" *Reed*, 737 N.W.2d at 584 (quoting *Sorg*, 275 Minn. at 5, 144 N.W.2d at 786). The eyewitness identifications of Barrientos–Quintana in this case did both.

Finally, the weakness of Barrientos–Quintana's alibi defense in this case affects our prejudice analysis. This evidence is not, strictly speaking, corroboration of Hernandez's statements, but rather forms part of the "evidence *as a whole* [, which] must both affirm the truth of the accomplice's testimony and point to the defendant's guilt." *Clark*, 755 N.W.2d at 255. The four alibi witnesses—I.C., her two relatives, and Barrientos–Quintana's brother—presented inconsistent stories that changed several times during the investigation. We hold that the district court's error in failing to give the accomplice instruction required under Minn.Stat. § 634.04 did not affect Barrientos–Quintana's substantial rights because there is not a reasonable likelihood that the error had a significant effect on the jury's verdict. *See Griller*, 583 N.W.2d at 741.

## II.

■ We next address Barrientos–Quintana's argument that the district court erred when it imposed sentences on all eight counts for which the jury found him guilty. At Barrientos–Quintana's sentencing, the district court imposed a sentence of life in prison without the possibility of parole, plus 12 months, on the first murder count and stated that the sentences for the remaining murder counts would "merge" with count 1. The court then imposed a consecutive sentence of 192 months for the attempted murder conviction on count 5. As it did with the first sentence, the court stated that counts 6–8 would "merge" with count 5. The district court record, however, reflects that judgment was entered and sentences were imposed on all eight counts.

■ Barrientos–Quintana argues that we should vacate the redundant sentences on counts 2–4 and 6–8. Under Minn.Stat. §§ 609.035 and 609.04 (2008), a defendant convicted of alternative counts of first-degree murder for a single criminal act involving a single victim may be convicted and sentenced for only one of the offenses. *See State v. Earl,* 702 N.W.2d 711, 723–24 (Minn.2005); *State v. Pflepsen,* 590 N.W.2d 759, 767 (Minn.1999). Regardless of what the district court stated orally at sentencing, we "look to the official judgment of conviction, which generally appears as a separate entry in the file, as conclusive evidence of whether an offense has been formally adjudicated." *Pflepsen,* 590 N.W.2d at 767. Because the record reflects that Barrientos–Quintana was formally adjudicated and sentenced on all eight counts, we vacate his convictions and sentences on counts 2–4 and 6–8, leaving the jury verdicts on those counts in force. *See Earl,* 702 N.W.2d at 723–24. We remand the case to the district court to correct the official judgment of conviction to reflect the formal adjudication and sentence on counts 1 and 5 only.

Affirmed in part, vacated in part, and remanded.

STRAS, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

### ANDERSON, PAUL H., J.

I respectfully dissent. The majority, despite its holding that the district court committed plain error in this case, affirms Edgar Rene Barrientos–Quintana's convictions on the ground that the court's error was harmless. In my view, the court's failure to instruct the jury that it could not find Barrientos–Quintana guilty based upon the uncorroborated testimony of Marcelo Hernandez affected Barrientos–Quintana's substantial rights. Accordingly, I would hold that the court's plain error was not harmless, reverse Barrientos–Quintana's convictions for first-degree murder and attempted first-degree murder, and remand the case for a new trial.

The majority affirms Barrientos–Quintana's convictions because it concludes that the evidence in the record—specifically, the testimony of two eyewitnesses—corroborates Hernandez's story that Barrientos–Quintana was the shooter. But our precedent requires more of us. In an accomplice-instruction case applying a harmless-error analysis, we have said that "a simple mechanical analysis of the record to determine whether corroborating evidence was presented is not sufficient" to determine harmlessness. *State v. Shoop,* 441 N.W.2d 475, 480–81 (Minn.1989). We stated that more careful scrutiny is required because

> [s]uch an analysis may not disclose the possibility that a jury, in considering the credibility of the witnesses, may have

rejected the corroborating evidence, leaving the testimony of the accomplice standing alone, uncorroborated. Instead, the focus must be upon the impact of the error on the verdict.

*Id.* at 481. In addition, "the quantum of corroboration needed" to find an error harmless "varies with the unique circumstances of each case," and the greater the danger that a particular witness "has been induced to offer incriminating testimony . . . based on self-serving motives," the greater the need for corroboration to "restore confidence." *See State v. Clark,* 755 N.W.2d 241, 256 (Minn.2008).

In deciding whether the omission of a required jury instruction likely affected a verdict, we consider the weight of the accomplice testimony relative to other evidence in the record and the overall strength of the evidence corroborating the accomplice's statements. *See Clark,* 755 N.W.2d at 255. In *State v. Reed,* 737 N.W.2d 572, 585 (Minn.2007), for example, we held that even though the failure to give an accomplice instruction was plain error, the error did not affect substantial rights because of the strength of the corroborating evidence. The defendant in *Reed* was convicted of shooting a police officer. Part of the testimony against Reed came from an accomplice—his girlfriend—who made a false emergency telephone call on Reed's behalf in order to lure the police officer to the scene of the murder. *Id.* at 578. But the accomplice's testimony amounted to a small fraction of the total evidence against Reed. The corroborating evidence formed the primary evidence of Reed's guilt, including extensive statements by Reed regarding his plan to kill a police officer and his own admission of guilt to a non-accomplice witness. *Id.* at 585.

In *State v. Clark,* a second defendant tried for the murder of the same police officer as in *Reed* appealed his conviction. 755 N.W.2d at 244–45. We held that the failure to give an accomplice instruction regarding the same accomplice (Reed's girlfriend) was plain error that affected Clark's substantial rights and required a new trial. *Id.* at 252–53. Our analysis in *Clark* focused on the strength of the corroborating evidence in *Reed* and the relative paucity of corroboration in Clark's trial. *Id.* at 252 ("[T]he State's evidence at Reed's trial was stronger than the State's evidence against Clark.").

At Clark's trial, Reed's girlfriend testified that after she made the emergency call, she and Reed went to meet Clark at his house and stayed there for a brief time—the time during which the officer was shot. *Id.* at 247. Clark lived just 102 feet from the site where the police officer was killed, and his home was situated in the direction from which the fatal bullet was fired. *Id.* at 254. Witnesses testified about Clark's association with Reed and the fact that Clark had expressed agreement with Reed's advocacy for the killing of a police officer. *Id.* Reed and Clark had been seen together many times with a weapon like the one used in the shooting. *Id.* Further, Clark was seen with Reed, who was carrying a rifle, walking toward Clark's house just one-half hour before the shooting. *Id.* But no witness other than the accomplice (Reed's girlfriend) placed Clark at the scene of the crime or testified to any statements made by Clark that were suggestive of his involvement. The fact that the accomplice's testimony was the most important piece of evidence against Clark led us to reverse Clark's conviction on the ground that the district court failed to give an accomplice instruction.

These recent decisions lead me to conclude that Barrientos–Quintana's conviction should be reversed for similar

reasons. Hernandez's testimony unquestionably formed the heart of the State's case against Barrientos–Quintana. The only evidence corroborating Hernandez's testimony came from W.F. and A.B.— two teenage eyewitnesses who were associated with the South Side Raza (SSR) gang that was the target of the shooting. W.F. named "Smokey" as the shooter after first denying any knowledge, and later W.F. made a very tentative photo lineup selection, stating that Barrientos–Quintana "kinda looks like the shooter." A.B. chose Barrientos–Quintana from a photo lineup. This corroborating testimony was thin evidence of guilt relative to Hernandez's detailed account of Barrientos–Quintana's guilt.

If the jury accepted the eyewitnesses' statements, the statements would amount to "sufficient corroborating evidence . . . to restore confidence in the truth of [Hernandez's] testimony." *See Clark*, 755 N.W.2d at 256. The problem, of course, is the not-insignificant possibility that the jurors rejected the corroborating testimony and instead relied on Hernandez's statements standing alone. *See Shoop*, 441 N.W.2d at 481. The jurors might have rejected the testimony of W.F. and A.B. for several valid reasons. W.F., A.B., and J.G. (who did not identify Barrientos–Quintana as the shooter) provided inconsistent accounts of the number of people in the vehicle. Their accounts ranged from one to three people in the backseat where the shooter was sitting. W.F. and A.B. were friends of L.P. and his older brother J.P., the leader of the gang Hernandez stated was the target of the shooting. The witnesses admitted that they initially lied to the police about their observations of the shooter, stating that the shooter wore a bandana and sunglasses covering his face. Only W.F. had seen Barrientos–Quintana before, and once presented with photographs to compare with his memory, his selection

from the lineup was tentative. Further, the photo of Barrientos–Quintana that was included in the lineup showed him with very close-cut hair—a haircut consistent with all of the eyewitnesses descriptions of the shooter. Photos of Barrientos–Quintana taken on the day of the shooting, by contrast, showed that his hair was much longer than it was in the lineup photo.

Jurors could reasonably have rejected the testimony of the eyewitnesses for any of those reasons and, not knowing that they must find corroboration for the testimony of an accomplice, nonetheless reached a guilty verdict based on Hernandez's testimony alone. Although the majority correctly notes that the jurors' request to rehear Hernandez's testimony does not tell us that the jury in fact rejected the corroborating evidence, that sequence of events does tell us that the jury relied most heavily on Hernandez's testimony rather than that of the eyewitnesses.

The final relevant consideration in my analysis of the substantial-rights prong is Hernandez's inherent untrustworthiness as a witness. Cases with highly unreliable accomplices require stronger corroborating evidence than cases like *Clark*, where we found no basis to conclude that the accomplice testified "based on self-serving motives" but nonetheless reversed the conviction because the corroborating evidence was weak compared to the accomplice's testimony. *Clark*, 755 N.W.2d at 256. Hernandez came forth with his story after months of denying any involvement in the shooting, and after twice implicating a third party as the shooter. Only when the police officers implied to Hernandez that he could be treated as a mere "witness" rather than a "suspect" did he implicate Barrientos–Quintana, the person who already had been indicted for the crime. Under the facts as Hernandez describes them, he could have been, but was not,

charged as an aider and abettor for his role in the shooting.

Moreover, Hernandez was an untrustworthy witness because certain parts of his testimony simply do not hold up when scrutinized. For example, Hernandez claimed that one of Barrientos–Quintana's motives for the shooting was the fact that Slappy and Beaver told him I.C. was at the SSR house that evening. Although the evidence showed that I.C. sometimes visited the SSR house, the evidence also unequivocally established that Barrientos–Quintana was at Cub Foods with I.C. about thirty minutes before the murder. I.C. was not at the SSR house on the day of the shooting, and Barrientos–Quintana could not possibly have believed that she was there. That statement about Barrientos–Quintana's purported motive for committing the shooting therefore lacks credibility.

In sum, the record reveals many reasons for the jury to reasonably reject the corroborating evidence. Hernandez was an unreliable witness whose testimony unquestionably formed the heart of the State's case, and the jury relied heavily on Hernandez's testimony without knowledge that an accomplice's testimony must be corroborated. For all of these reasons, I disagree with the majority's conclusion that the district court's error in failing to give an accomplice instruction was harmless. I conclude that there is a reasonable likelihood that the court's error had a significant effect on the verdict. *See State v. Griller*, 583 N.W.2d 736, 741 (Minn.1998).

Having concluded that Barrientos–Quintana has met his burden on the third prong of the plain-error test, I would proceed to the fourth prong. This prong asks whether "reversal ... is necessary ... to ensure fairness and the integrity of the judicial process." *Clark*, 755 N.W.2d at 252–53. I conclude that where the district court's error left the jury unaware of its duty to find corroborating evidence and that error affected the defendant's substantial rights, the fourth prong is met. Accordingly, I would reverse Barrientos–Quintana's conviction and remand this case to the district court for a new trial.