*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1069**

State of Minnesota,
Respondent,

vs.

Jesus Arroyo, III,
Appellant.

**Filed June 13, 2016
Affirmed
Hooten, Judge**

Blue Earth County District Court
File No. 07-CR-13-4273

Lori Swanson, Attorney General, Edwin W. Stockmeyer, Assistant Attorney General, St. Paul, Minnesota; and

Patrick McDermott, Blue Earth County Attorney, Mankato, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, John Donovan, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Hooten, Presiding Judge; Larkin, Judge; and Rodenberg, Judge.

**U N P U B L I S H E D   O P I N I O N**

**HOOTEN**, Judge

On appeal from his convictions of kidnapping, attempted first-degree aggravated robbery, and second-degree assault, appellant argues that the district court committed

reversible error by failing to instruct the jury that it could not convict him based on the uncorroborated testimony of his accomplice. We affirm.

## FACTS

Appellant Jesus Arroyo, III, was charged with two counts of kidnapping, one count of attempted first-degree aggravated robbery, and one count of second-degree assault arising out of an incident that took place on November 19, 2013. A jury trial was held in March 2015. The state introduced the following evidence at trial.

Around 9:00 p.m. on November 19, 2013, J.S. was attacked in the parking lot of a Kohl's department store in Mankato. J.S. testified that upon exiting Kohl's, she saw a vehicle parked near her own that was occupied by two individuals, a female driver later identified as Josefina Arreola and a male passenger later identified as Arroyo. Arroyo was wearing a skeleton mask and dark clothing. As J.S. approached her car, Arroyo and Arreola exited their vehicle. Arroyo walked up to J.S., held a knife to her throat, and said, "[G]ive me your f--king purse." Arroyo pushed J.S. against her car, stated that he intended to take both J.S. and her vehicle, and instructed Arreola to help him place J.S. in the backseat of J.S.'s car. While Arroyo and Arreola struggled to open the vehicle's rear door, J.S. resisted and yelled for help. Arroyo responded by repeatedly stabbing her in the side and, after dropping his knife, repeatedly punching her in the head.

During the attack, D.R., a Kohl's employee, was outside on his break. D.R. testified that he heard J.S.'s cries and ran toward the disturbance. Arreola tried to stop D.R. from reaching J.S. and Arroyo, but D.R. pushed her aside. As D.R. approached, Arroyo let go of J.S., and he and Arreola retreated to their vehicle and drove away. D.R. called 911 and

2

described Arroyo and Arreola's vehicle to the 911 operator as an older gray Oldsmobile that bore a license plate containing the number 7 and the letters G and J. Another witness testified that the vehicle was "an older car" and "boxy."

Shortly thereafter, police located an unoccupied vehicle matching this description parked in front of a nearby Subway restaurant. The vehicle's license plate was 387 KGJ. Inside the vehicle, officers found mail addressed to Arroyo, a black hooded sweatshirt, and items that investigators associate with kidnapping crimes, specifically, duct tape and several pairs of latex gloves. Officers brought D.R. to see the vehicle and, based on its appearance and the clothing inside, he was certain that this was the vehicle that the attackers had driven.

Arreola's brother testified that he picked up Arreola and Arroyo at Walmart, which was near Subway, around 10:00 p.m. that night. Arreola had called him and told him that their vehicle ran out of gas. The jury also heard testimony from a witness who joined Arreola's brother in picking up Arroyo and Arreola. The witness stated that Arreola and Arroyo said that their car had "broke[n] down," and he found it odd that neither Arreola nor Arroyo wanted to go back to where the car was to make sure that it was secure.

Officers reviewed video surveillance from Walmart. The video showed Arroyo and Arreola exiting Walmart at approximately 10:02 p.m. on November 19. The video also showed Arroyo and Arreola being picked up by a vehicle.

Cellular phone records from Arroyo's and Arreola's cell phones were introduced at trial. D.R. had called 911 at 9:06 p.m. on the night of the attack. Seven calls were placed or received on Arroyo's cell phone between 9:11 p.m. and 9:25 p.m., and twelve calls were

placed or received on Arreola's cell phone between 9:07 p.m. and 10:01 p.m. All of these calls were placed from a geographic area that encompassed Kohl's, Subway, and Walmart. Arroyo's cell phone also placed a phone call at 10:23 p.m. from an area between Mankato and Le Center, where he lived. Arroyo and Arreola were in possession of their cell phones the following day.

On November 20, Arroyo contacted the Le Center Police Department and reported that his mother's vehicle had been stolen, describing the vehicle as a gray Oldsmobile. Le Center Police Chief Robert Pfarr learned that the vehicle's license plate was 387 KGJ. Arroyo reported that the vehicle had been parked behind his apartment complex the night before and that it was gone in the morning. While Police Chief Pfarr was taking the complaint, he was advised that the Mankato Department of Public Safety was in possession of Arroyo's vehicle because it was suspected in an attempted robbery and carjacking.

Later on November 20, Mankato Department of Public Safety Detective Jim Card interviewed Arroyo at the Le Sueur County Jail. Arroyo stated that he was with Arreola in Le Center the previous night. Detective Card testified that, after he told Arroyo that he believed Arroyo was involved in criminal activity, Arroyo stated that Detective Card "should just lock him up." Detective Card asked Arroyo why, and Arroyo repeated that he should just be locked up and then stood and placed his hands behind his back. Detective Card placed Arroyo under arrest and transported him to the Blue Earth County Jail.

Arreola also met with police on November 20. She gave a statement claiming that she had been home all evening on November 19. After Arreola saw Arroyo in handcuffs, she was *Mirandized* and gave another statement, in which she told police that she and

4

Arroyo had been in the Kohl's parking lot that night and that Arroyo had assaulted J.S. She also claimed that she had mental health problems and that she was having hallucinations on November 19.

On November 21, Detective Card interviewed Arroyo at the Blue Earth County Jail, and an audio recording of this interview was played for the jury. When Detective Card asked Arroyo direct questions about his involvement in the crime, there were sometimes lengthy pauses before he answered. Arroyo stated that he was struggling with mental health problems on the date of the offense. He admitted to taking some of Arreola's medications on a regular basis. When asked if, after taking Arreola's medication, he and Arreola came to Mankato and tried to steal a woman's purse, Arroyo first replied, "It's possible," but then claimed that he did not remember that. Toward the end of the interview, Detective Card asked Arroyo if he was with Arreola in the Kohl's parking lot on November 19 around 9:00 p.m., and Arroyo replied, "I don't remember that" before stating that he remembered being at his residence in Le Center. Detective Card testified that Arroyo made several non-verbal admissions during the interview that he found significant: Arroyo did not consistently deny being involved in the attack, he failed to answer "significant questions," he did not offer any alternative theories or explanations of what had occurred, he tried to change some questions and did not answer other questions, and there were sometimes "long pauses" before he answered questions.

In July 2014, after Arreola had been formally charged in relation to this offense, she gave another statement to police. Arreola admitted that she and Arroyo were involved in attacking J.S. She also stated that the attack surprised her because she did not know what

5

Arroyo was planning. She described how Arroyo got out of the car, approached J.S., and stabbed and punched her. She heard Arroyo say to J.S., "[G]ive me your f--king purse." Arreola believed that the attack was financially motivated because Arroyo had recently lost his job.

Police sent DNA samples from J.S., Arroyo, and Arreola to the Minnesota Bureau of Criminal Apprehension for comparison with a mixed sample taken from the handle of a black knife found behind J.S.'s vehicle on the night of the attack. That comparison revealed that J.S.'s DNA was not on the knife handle. But, neither Arroyo's nor Arreola's DNA could be excluded from contributing to the mixed sample found on the knife handle, even though 99.8% of the world's population could be excluded.

At trial, Arreola testified on behalf of the state. The state had dismissed the charges against her, with Arreola understanding that she would testify against Arroyo. Arreola testified that she and Arroyo were parked in the Kohl's parking lot on the evening of November 19 and that Arroyo got out of the vehicle when he saw J.S. approach her vehicle. He was wearing dark clothing and a skull mask. Arreola testified that she got out of the car, too, but she was confused about what was going on. Arreola claimed that she was "having hallucinations that day" due to mental health problems. She saw Arroyo stab and hit J.S. Arreola described the knife that Arroyo had with him during the attack as a black folding knife with a black blade. She claimed that she "bumped into" D.R. and then got back into Arroyo's vehicle at Arroyo's instruction. Arroyo and Arreola left the scene in what Arreola described as a "big and boxy" Oldsmobile, noting that the vehicle belonged to Arroyo's mother. Arreola testified that she blacked out and remembered waking up at

Walmart with Arroyo.  Arreola called her brother and asked him to pick them up, and her brother picked them up and brought them to their residence in Le Center.

The jury found Arroyo guilty of all counts, and he was later sentenced.  This appeal followed.

## D E C I S I O N

Arroyo argues that the district court committed reversible error by failing to instruct the jury that a conviction cannot rest upon the uncorroborated testimony of an accomplice. We review for plain error because Arroyo did not request that the district court give an accomplice testimony instruction.  *See State v. Matthews*, 779 N.W.2d 543, 548 (Minn. 2010).  Under the plain error test, an appellant must show that there was (1) error, (2) that was plain, and (3) that affected his substantial rights.  *Id.*  "An error is plain if it is clear and obvious; usually this means an error that violates or contradicts case law, a rule, or an applicable standard of conduct."  *Id.* at 549.  To show that plain error affected his substantial rights, an appellant "bears the heavy burden of showing prejudice, which means there [must be] a reasonable likelihood that [the plain error] had a significant effect on the jury verdict."  *State v. Barrientos-Quintana*, 787 N.W.2d 603, 612 (Minn. 2010) (quotations omitted).

Accomplice testimony is inherently suspect, *State v. Jackson*, 746 N.W.2d 894, 898 (Minn. 2008), due to concern that an accomplice will offer self-serving, dishonest testimony, *State v. Clark*, 755 N.W.2d 241, 253 (Minn. 2008).  As such, accomplice testimony is insufficient to sustain a conviction, unless corroborated by other evidence that "tends to convict the defendant of the commission of the offense."  *See* Minn. Stat. § 634.04

(2012). Corroborating evidence must do more than merely show that an offense was committed or the circumstances of its commission. *Id.* But, corroborating evidence need not establish a prima facie case of guilt, *State v. Adams*, 295 N.W.2d 527, 533 (Minn. 1980), or address each element of the crime, *State v. Lemire*, 315 N.W.2d 606, 610 (Minn. 1982). Rather, corroborating evidence must be "weighty enough to restore confidence in the accomplice's testimony, confirming its truth and pointing to the defendant's guilt in some substantial way." *State v. Hooper*, 620 N.W.2d 31, 39 (Minn. 2000) (quotation omitted).

"[District] courts have a duty to instruct juries on accomplice testimony in any criminal case in which it is reasonable to consider any witness against the defendant to be an accomplice." *Clark*, 755 N.W.2d at 251 (quotation omitted). "A witness is considered an accomplice if [he or she] could have been indicted and convicted for the crime with which the accused is charged." *Id.* (quotation omitted). The state concedes that the jury could have reasonably considered Arreola to be an accomplice. For the following reasons, we agree.

J.S. testified that, while she was being attacked, Arreola tried to open the door of J.S.'s vehicle so that Arroyo could get J.S. into the back seat. D.R. testified that when he tried to intervene, Arreola tried to stop him from breaking up the altercation. Arreola was charged in connection with the attack, and the record suggests that her charges were dismissed only because she agreed to testify against Arroyo. The jury could have reasonably considered Arreola to be an accomplice because the evidence at trial tended to indicate that Arreola "intentionally aid[ed]" Arroyo in the commission of the crimes.

8

Minn. Stat. § 609.05, subd. 1 (2012); *see also Barrientos-Quintana*, 787 N.W.2d at 611 ("A person who plays some knowing role in the commission of the crime and takes no steps to thwart its completion can be held liable as an accomplice." (quotations omitted)). Therefore, the district court committed plain error by failing to give an accomplice testimony instruction. *See Barrientos-Quintana*, 787 N.W.2d at 612.

However, Arroyo cannot sustain his heavy burden under the third prong of the plain error test, i.e., that the failure to give an accomplice testimony instruction affected his substantial rights, because Arreola's testimony that Arroyo was the masked man who attacked J.S. was sufficiently corroborated by other evidence produced at trial. Corroborating evidence may include the defendant's association with those involved with the crime, motive, opportunity, proximity to the crime, and admissions. *State v. Her*, 668 N.W.2d 924, 927 (Minn. App. 2003), *review denied* (Minn. Dec. 16, 2003). Corroborating evidence may also consist of "physical evidence associated with the crime" and "suspicious and unexplained conduct of [the defendant] before or after the crime." *State v. Pederson*, 614 N.W.2d 724, 732 (Minn. 2000). When the sufficiency of corroborating evidence is challenged, we view such evidence in the light most favorable to the verdict and resolve any inconsistencies in favor of the state. *State v. Pippitt*, 645 N.W.2d 87, 93 (Minn. 2002). "Corroborating evidence may be circumstantial or direct." *Adams*, 295 N.W.2d at 533.

The evidence produced at trial established the following circumstances. J.S. identified her masked assailant as male and the other suspect as female. The black knife found near J.S.'s vehicle matched Arreola's description of the knife that Arroyo used during the attack. The assailant drove a vehicle consistent with the vehicle owned by

Arroyo's mother in make and license plate. After the attack, this vehicle was found in a nearby parking lot. Clothing inside the vehicle matched witnesses' description of the assailant's clothing, and mail addressed to Arroyo was found inside the vehicle. Video surveillance showed Arroyo and Arreola together, shortly after the attack, at the Walmart near where the vehicle was found. Arreola and Arroyo asked Arreola's brother to drive them home instead of purchasing gas in Mankato and driving themselves home. Arreola and Arroyo did not seem concerned about the vehicle that they had abandoned. D.R. called 911 to report the attack at 9:06 p.m. on November 19. Arroyo made six phone calls between 9:11 p.m. and 9:25 p.m. that night, and Arreola made twelve phone calls between 9:07 p.m. and 10:01 p.m. All of these phone calls originated from an area encompassing Kohl's, Subway, and Walmart in Mankato. Arroyo and Arreola were in possession of their cell phones the following day. Arroyo's DNA was consistent with the mixed DNA sample taken from the black knife found at the scene of the attack. Arroyo told investigators that he was at his residence in Le Center on the night of the attack, which was inconsistent with the Walmart video surveillance and the testimony of Arreola's brother. After Detective Card told Arroyo on November 20 that he thought Arroyo was involved in the attack, Arroyo twice stated that Detective Card should "just lock him up," and Arroyo then placed his hands behind his back. Finally, during the November 21 interview, Arroyo hesitated and was equivocal in denying his involvement in the attack.

Because there was sufficient evidence in the record to corroborate Arreola's testimony that Arroyo was the assailant, Arroyo is unable to show that there is a reasonable

likelihood that the district court's failure to give an accomplice testimony instruction had a significant effect on the jury verdict and affected his substantial rights.

**Affirmed.**